ELSIE T. MORRISON EMPLOYEE, PLAINTIFF v. BURLINGTON INDUSTRIES, EMPLOYER, AND LIBERTY MUTUAL INSURANCE COMPANY, CARRIER, DEFENDANTS

No. 114

(Filed 6 October 1981)

**Master and Servant §§ 68, 72— total incapacity partially caused by occupational disease—compensability**

Where the evidence supported the Industrial Commission's conclusion that claimant was totally disabled and 55 percent of her disability was due to an occupational disease and 45 percent of her disability was due to other physical infirmities including bronchitis, phlebitis, varicose veins and diabetes, it was not error for the Industrial Commission to award claimant compensation for a 55 percent partial disability rather than for total disability. In occupational disease cases, disablement of an employee resulting from an occupational disease which arises out of and in the course of the employment, G.S. 97-52 and G.S. 97-2(6), is compensable and claimant has the burden of proof "to show not only disability, but also its degree." The Commission does not have authority to award a claimant compensation for total disability when 40 to 50 percent of the claimant's disablement is not occupational in origin and was not aggravated or accelerated by any occupational disease.

Justice EXUM dissenting.

Justice CARLTON joins in this dissent.

APPEAL pursuant to G.S. 7A-30(2) from decision of the North Carolina Court of Appeals, 47 N.C. App. 50, 266 S.E. 2d 741 (1980),

1

reversing an award of the Industrial Commission for partial disability and remanding for entry of an award for total disability. The case was argued as No. 60, Fall Term 1980 and re-argued as No. 77, Spring Term 1981.

Claimant, Elsie Morrison, certified to her employer in her Notice of Accident and Claim filed with the Commission that she had "contracted an occupational disease, *to wit*: byssinosis . . . caused by exposure to cotton dust" which had resulted in "permanent, total disability."

Three hearings were held in the matter after which Commissioner Brown concluded that Mrs. Morrison was entitled to compensation for total disability pursuant to G.S. 97-29.

Defendants appealed to the Full Commission which modified Commissioner Brown's findings and award. The Full Commission found that although Mrs. Morrison suffered from "chronic obstructive lung disease, an occupational disease," she also suffered "from phlebitis, varicose veins and diabetes" and such "conditions constitute an added factor in causing her disability." The Commission then found: "Due to the occupational disease suffered by plaintiff and due to her other physical infirmities, including bronchitis, phlebitis, varicose veins and diabetes, plaintiff has no earning capacity in any employment for which she can qualify in the labor market. Fifty-five percent of such disability is due to her occupational disease and 45 percent of such disability is due to her physical infirmities not related to her employment with defendant-employer." The Commission concluded upon these findings that Mrs. Morrison was entitled under G.S. 97-30 to compensation for a 55 percent partial disability and issued its award accordingly.

Mrs. Morrison appealed, and, by a majority vote, the Court of Appeals concluded the Commission lacked authority to award claimant compensation for partial rather than total disability. That court said:

> As a result of the Full Commission's amendments to Commissioner Brown's order, the Commission has found that plaintiff is totally disabled from work, that her disability was in part caused by occupational disease compensable under the law and in part caused by other noncompensable illnesses,

and therefore plaintiff is only entitled to compensation for partial, not total, disability. The Commission erred in this conclusion . . . . If the worker's incapacity to work is total and if the incapacity is occasioned by a compensable injury or disease, the worker's incapacity to work cannot be apportioned to other pre-existing or latent illnesses or infirmities, nor may the entitlement to compensation be diminished for such conditions.

47 N.C. App. at 55-56, 266 S.E. 2d at 744. The Court of Appeals remanded the matter to the Industrial Commission for entry of an order consistent with its opinion. Chief Judge Morris dissented on the ground that an employee should be compensated only for disability "resulting from the injury," and not for factors "totally unrelated to . . . employment."

On defendant's appeal to this Court arguments were first heard on 13 October 1980. Thereafter the Court, concluding "that the medical evidence before the Commission is not sufficiently definite on the cause of plaintiff's disability to permit effective appellate review," remanded the case to the Commission with the suggestion that the physicians more adequately address "the interrelations, if any, between the cotton dust exposure and claimant's other infirmities such as her bronchitis, upper respiratory infection, sinusitis, phlebitis, and diabetes."[1] 301 N.C. 226, 231, 271 S.E. 2d 364, 367 (1980). The Court ordered that new findings of fact be made based thereon.

Responding to this order, further testimony was taken before Commissioner Shuford from physicians Sieker, Battigelli and Mabe, each of whom had treated and examined Mrs. Morrison and had testified at the initial hearings. After rehearing, the Commission again made findings of fact, conclusions of law and an award

---

1. The Court formulated three questions to clarify the medical evidence, *to wit*:

(1) what percentage, if any, of plaintiff's disablement, *i.e.*, incapacity to earn wages, results from an occupational disease; (2) what percentage, if any, of plaintiff's disablement results from diseases or infirmities unrelated to plaintiff's occupation which were accelerated or aggravated by plaintiff's occupational disease; and (3) what percentage, if any, of plaintiff's disablement is due to diseases or infirmities unrelated to plaintiff's occupation which were *not* accelerated or aggravated by plaintiff's occupational disease. 301 N.C. at 231, 271 S.E. 2d at 367 (emphasis original).

based on all the evidence before it, including all evidence present-
ed prior to the remand of this Court. The Commission found the
following facts which are pertinent to this appeal:

5. Dr. Sieker examined plaintiff January 18, 1977. On
that date, plaintiff suffered from chronic obstructive lung
disease, and, according to Dr. Sieker, was unable to engage in
gainful employment because of chronic obstructive lung
disease. In Dr. Sieker's opinion, fifty percent to sixty percent
of plaintiff's incapacity for work resulting from chronic
obstructive lung disease was caused by exposure to cotton
dust during the course of her employment at Burlington In-
dustries, while the balance (forty percent to fifty percent) of
her incapacity for work resulting from chronic obstructive
lung disease was due to diseases and conditions which were
not caused, aggravated, or accelerated by exposure to cotton
dust during the course of her employment at Burlington In-
dustries. The plaintiff was also examined by Dr. Mario C.
Battigelli, who is of the opinion that the plaintiff is only
slightly incapacitated for work, if at all. In Dr. Battigelli's
opinion, the plaintiff, is at most, only twenty percent in-
capacitated for work and that the plaintiff's exposure to cot-
ton dust during the course of her employment at Burlington
Industries could have caused, aggravated, or accelerated as
little as none or as much as all of her twenty percent in-
capacity for work.

6. In addition to her chronic obstructive lung disease,
plaintiff suffers and has suffered from time to time with
phlebitis, varicose veins and diabetes. Such conditions con-
stitute an added factor in causing her incapacity for work,
and were not caused, aggravated, or accelerated by exposure
to cotton dust during the course of her employment at Bur-
lington Industries.

7. Plaintiff suffers from chronic obstructive lung disease,
due, in part, to causes and conditions characteristic of and
peculiar to her particular trade, occupation or employment in
the textile industry. That part of her lung disease which is
related to her employment is not an ordinary disease of life
to which the general public is equally exposed outside of such
employment.

8. Due to the chronic obstructive lung disease suffered by plaintiff, and due to her other physical infirmities, including bronchitis, phlebitis, varicose veins and diabetes, plaintiff has no earning capacity in any employment for which she can qualify in the labor market.

9. The claimant is only partially incapacitated for work as a result of conditions which were caused, aggravated, or accelerated by exposure to cotton dust during the course of her employment at Burlington Industries. Although the plaintiff is totally incapacitated for work, only fifty-five percent of her incapacity was caused, aggravated, or accelerated by exposure to cotton dust during the course of her employment at Burlington Industries. The remaining forty-five percent of the plaintiff's incapacity for work was not caused by an occupational disease, and was not caused, aggravated, or accelerated by an occupational disease or by exposure to cotton dust during the course of her employment at Burlington Industries.

10. A wage chart submitted by the defendant without plaintiff's objection and hereby made a part of the record shows plaintiff's average annual weekly wage to have been $119.77.

11. As a result of the chronic obstructive pulmonary disease caused by her exposure to cotton dust, plaintiff has only a partial incapacity for work. She has sustained a fifty-five percent loss of wage-earning capacity or ability to earn wages by reason of her cotton dust exposure. Her average weekly wage-earning capacity has been reduced by fifty-five percent of $119.77 or $65.87 per week. The balance of her wage loss was not caused by an occupational disease, and was not caused, aggravated, or accelerated by an occupational disease or exposure to cotton dust during the course of her employment at Burlington Industries.

The Commission, again, entered an award for 55 percent partial disability.

*Hassell & Hudson, by Charles R. Hassell, Jr., and Robin E. Hudson, Attorneys for plaintiff appellee.*

*Teague, Campbell, Conely & Dennis, by C. Woodrow Teague and George W. Dennis III, Attorneys for defendant appellants.*

*Smith, Moore, Smith, Schell & Hunter, by McNeill Smith, J. Donald Cowan, Jr., and William L. Young, Attorneys for defendant appellants.*

*Maupin, Taylor & Ellis, P.A., by Richard M. Lewis, Attorneys for National Association of Manufacturers of the United States of America, amicus curiae.*

*Johnson, Gamble & Shearon by Samuel H. Johnson, Attorneys for North Carolina Associated Industries, North Carolina Merchants Association, North Carolina Association of Plumbing-Heating-Cooling Contractors, Incorporated, amicus curiae.*

HUSKINS, Justice.

The sole question posed by this appeal is as follows: When the Industrial Commission finds as fact, supported by competent evidence, that a claimant is totally incapacitated for work and 55 percent of that incapacity is caused, accelerated or aggravated by an occupational disease and the remaining 45 percent of that incapacity for work was not caused, accelerated or aggravated by an occupational disease, must the Commission, under the Workers' Compensation Act of North Carolina, award compensation for 55 percent disability or 100 percent disability? Upon such findings of fact, our Act mandates an award for 55 percent partial disability.

Except as to questions of jurisdiction, the rule is that the findings of fact made by the Commission are conclusive on appeal when supported by competent evidence. This is so even though there is evidence to support a contrary finding of fact. *Morrison v. Burlington Industries*, 301 N.C. 226, 271 S.E. 2d 364 (1980); *Inscoe v. Industries, Inc.*, 292 N.C. 210, 232 S.E. 2d 449 (1977); *Anderson v. Construction Co.*, 265 N.C. 431, 144 S.E. 2d 272 (1965); *Rice v. Chair Co.*, 238 N.C. 121, 76 S.E. 2d 311 (1953); *Henry v. Leather Co.*, 231 N.C. 477, 57 S.E. 2d 760 (1950). The appellate court does not retry the facts. It merely determines from the proceedings before the Commission whether sufficient competent evidence exists to support its findings of fact. *Moses v. Bartholomew*, 238 N.C. 714, 78 S.E. 2d 923 (1953).

The evidence in this case, especially the medical evidence, overwhelmingly supports the Industrial Commission's findings

that 55 percent of Mrs. Morrison's inability to work and earn wages is caused by "chronic obstructive lung disease, due in part, to causes and conditions characteristic of and peculiar to her particular . . . employment in the textile industry," and the remaining 45 percent is caused independently by her other physical infirmities, including chronic obstructive lung disease not caused, aggravated or accelerated by an occupational disease, as well as bronchitis, phlebitis, varicose veins and diabetes, none of which are job related and none of which have been aggravated or accelerated by her occupational disease. This Court must accept such findings as final factual truth.[2] The Commission has found as

2. The following is some, but by no means all, of the evidence in the record of this appeal which supports the findings of the Commission on rehearing. It is unnecessary to recite contrary, confusing or ambiguous evidence.

Finding of Fact 5: The answer of each of the three doctors to our questions on remand demonstrates support for this finding:

Dr. Sieker:

Q. What percentage, if any, of the plaintiff's disablement, that is, incapacity to earn wages, results from an occupational disease?

A. Well, this lady, in my opinion from the information available, is disabled for all but the most sedentary types of occupation, so from a physical standpoint, except to set at a desk or sit at a job, she is totally disabled. My opinion from the history is that 50 to 60 percent of that disability can be related to her cotton dust exposure. That's a clinical judgment based on information from the history.

Q. What percentage, if any, of plaintiff's disablement results from diseases or infirmities unrelated to plaintiff's occupation which were accelerated or aggravated by plaintiff's occupational disease?

A. Again my testimony before was that by clinical judgment that the history of cigarette smoking as a related factor has to be assigned an etiologic contribution to her total chronic obstructive lung disease, and that assignment was 40 to 50 percent.

Q. What percentge, if any, of plaintiff's disablement is due to diseases or infirmities unrelated to plaintiff's occupation which were not accelerated or aggravated by the plaintiff's occupational disease?

A. Her disability is due to chronic obstructive lung disease that has several etiologic factors, so that for all intents and purposes is a hundred percent disability except for sedentary work. There is no contribution from her phlebitis or her diabetes or sinusitis or rhinitis to her disability. Now if you look at the reasons for her having chronic obstructive lung disease and make me assign percentages, I have to come back to what I did before and make the same assignments I did.

fact that Mrs. Morrison's infirmities other than "chronic obstructive lung disease due in part to cotton dust exposure" *were*

*Dr. Battigelli*:

Q. What percentage, if any, of plaintiff's disablement, that is, incapacity to earn wages, results from an occupational disease?

A. And my answer would be, again, what I think I have offered beforehand; something between zero, meaning no disability, no consequence, no effect from her occupation, up to twenty percent of a whole-man assessment.

Q. What percentage, if any, of plaintiff's disablement results from diseases or infirmities unrelated to plaintiff's occupation which were accelerated or aggravated by plaintiff's occupational disease?

A. Namely, there was no acceleration of any significant process that I could identify and justify on medical grounds that I could shore up and buttress on the basis of the evidence that I have gathered in examining this patient and what I know of available data and information which could lead me to believe that anything has been accelerated by exposure to cotton dust. So the answer is negative to the acceleration. For the aggravation, when the patient tells me "I feel worse when dust is there," I cannot interpret that; I have to report it. I have to accept it as a fact. I can only qualify, saying that that aggravation is restored by removal from exposure, and therefore there is no clinical meaningful change in the natural course of that patient's problems, or disorder, or disease, if you wish.

Q. What percentage, if any, of plaintiff's disablement is due to diseases or infirmities unrelated to plaintiff's occupation which were not accelerated or aggravated by plaintiff's occupational disease?

A. And my answer is from twenty percent downward, in the sense that it may be responsible for all or part of that.

*Dr. Mabe*:

Q. Is it fair to say that you cannot give the percentages that were requested by the Supreme Court?

A. Well, you know, really, by not being—I think Dr. Battigelli and Dr. Sieker or the other pulmonary specialists, if they're going to take something—you know, I'm really not sure. We do not have any—I have Dr. Sieker's letter and probably Dr. Battigelli's letter at the office. I don't have it in her file here. I'm sure they got respiratory function tests on her and know the degree. We did not get respiratory function tests on her at the time, because we didn't have the capability, then that would still require some expertise in, certainly, interpreting it. And I think the percentage certainly should be left up to Dr. Battigelli and Dr. Sieker, who both, I understand, have seen the patient and have been over the patient.

*disabling* in and of themselves. *See* Findings of Fact 5, 6, 8, 9 and 11. We are bound by these findings though there is evidence to the contrary.

Finding of Fact 6: Mrs. Morrison testified she suffers from diabetes and phlebitis. Medical reports in evidence reflect all of the infirmities found by the Commission and more including depression, sinusitis and hysterectomy. On a proof of total disability form filed 26 January 1976 with a private insurer Mrs. Morrison listed the "origin and nature of disability" as "chronic bronchitis, diabetes mellitus, early pulmonary fibrosis, phlebitis of left leg, emphysema."

Mrs. Morrison was placed in a dust-free environment by her employer to alleviate her breathing problems. She left this position because the standing aggravated her phlebitis. Dr. Mabe testified:

> Q. Well, assuming that the record would support such a finding, that is, that when she was switched from one job to another and that job required her to stand, and that she was not able to tolerate that because of her leg problem, would you agree that in that circumstance that the leg problems would have to be considered an additive factor in maintaining that type of a job and in her disability?
>
> A. If she complained, you know, that in changing jobs, that she had one that was more walking and she complained of the leg and attributed this to her old phlebitis, then, you know, that would have to be an additive part.
>
> Q. In her disability? Or — for that particular — her ability to earn wages in that particular job?
>
> A. In that particular job.
>
> Q. So, then, your answer to my question would be, yes, with the explanation you gave?
>
> A. Well, in reading it, the first thing I see, you know, that I — in the previous testimony, "it would have to be a self-employed thing where, you know, she could work at will. In other words, she could not have been a satisfactory employee."
>
> I meant the lung disease. Now, later on down here, "she could not work this type of thing or could not stand. She had a leg problem, too," which was at that time a problem evidently. And I'd certainly have to stand by that. Yes. That would be an added disability.

Again, this is only part of the evidence which supports the Commission finding. *See* in particular, the testimony of Dr. Battigelli as supporting finding of fact 5.

Finding of Fact 7: Mrs. Morrison testified to her continuous exposure to cotton dust since 1948 until she left work in April 1975. The finding that Mrs. Morrison's chronic obstructive lung disease is *"due, in part"* to an occupational disease is supported by testimony by claimant and the doctors about the extent and effect of her smoking and the fact she has bronchitis. Dr. Battigelli noted in an April 1975 report in the record: "She does not present convincing cyclic disorder which would allow

The doctors expressed varied opinions on the extent of the medical disability of Mrs. Morrison. There is a distinction between medical and legal disability. It is up to the Commission to determine the degree of legal disability under the Act. To ignore the distinction between the legal and medical concepts of disability confuses the ultimate issue and obscures the function of the fact finder. We must now determine the proper degree of legal disability for workers' compensation purposes.

In the field of workers' compensation law, the statutes control. We must follow the dictates of our legislature on what is or is not compensable.

The parties agree that the evidence is sufficient to sustain the Commission's finding that Mrs. Morrison contracted an occupational disease while employed by Burlington Industries; that she is totally incapacitated for work; and that the occupational disease caused only part of her total incapacity.

---

the diagnosis of byssinosis. However in view of her substantial chronic respiratory impairment additional exposure to lint may conceivably deteriorate her situation. I suggest to relocate this patient to a similar activity in a more sheltered environment. If impossible the patient has enough justification to apply for Social Security and I'll be happy to support her in her claim on the grounds of severe venous insufficiency, chronic obstructive lung disorder, depression, status post op. hysterectomy."

Finding of Fact 8: Mrs. Morrison testified she is unable to walk up steps or any distance or lift anything without shortness of breath. All the medical testimony supports the finding that she is totally unable to earn wages "except at the most sedentary type of work." In a letter written 4 March 1976 Dr. Battigelli stated, "I have examined Mrs. Morrison on 8 April 1975 for dyspnea on light exertion and on exposure to dust and fumes. At that time, she presented severe obstructive lung disorder, documented by pronounced deficit in spirometry . . . by hypoxemia . . . and by decreased diffusion parameter . . . . She also had evidence of pulmonary shunt . . . . I conclude that she is totally disabled to gainful employment. She is therefore entitled to . . . benefits . . . under Social Security . . . . I must add that she has additional sources of physical impairment, inclusive of severe venous insufficiency of lower extremities, diabetes and borderline left ventricular enlargement, all associated to dyspnea on exertion."

Finding of Fact 9: This finding is supported by the doctors' testimony. The doctors' testimony would support any finding from 0% to 60% occupational disease. The Commission was within its fact finding jurisdiction when it found within this range.

Finding of Fact 10: There is no dispute about the compensation figures.

Finding of Fact 11: The evidence cited under findings 6 through 10 support this as an ultimate finding of fact.

Defendants contend that the "resulting from the injury" language in both G.S. 97-29 and 97-30 means that she is entitled to compensation *only to the extent of* the occupational disease's contribution. Hence, she is entitled to compensation for partial disability, not total disability, because the occupational disease caused only part of the disability. Therefore G.S. 97-30, not G.S. 97-29, governs the compensation that should be paid in this case. Those statutes in pertinent part read as follows:

§ 97-29. *Compensation rates for total incapacity.* — Except as hereinafter otherwise provided, where the incapacity for work *resulting from the injury* is total, the employer shall pay . . . .

§ 97-30. *Partial incapacity.* — Except as otherwise provided in G.S. 97-31, where the incapacity for work *resulting from the injury* is partial, the employer shall pay . . . . (Emphasis added.)

Mrs. Morrison contends that our Workers' Compensation Act permits no such apportionment of an award in a case of total incapacity. She argues that if an occupational disease acting together with non-job-related infirmities causes total disability the employee is entitled to compensation for total disability.

The North Carolina Workers' Compensation Act was enacted in 1929. It is not, and was never intended to be, a general accident and health insurance act. "We should not overstep the bounds of legislative intent, and make by judicial legislation our Compensation Act an Accident and Health Insurance Act." *Lewter v. Enterprises, Inc.,* 240 N.C. 399, 403, 82 S.E. 2d 410, 414 (1954); *Conrad v. Foundry Co.,* 198 N.C. 723, 153 S.E. 266 (1930).

G.S. 97-2(6) defines "injury" to mean "only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident."

G.S. 97-2(9) defines the term "disability" to mean "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." Disablement resulting from all occupational diseases (except asbestosis and silicosis) is "equivalent to 'disability' as defined in G.S. 97-2(9)." G.S. 97-54.

When it became apparent that the Act should include a provision for payment of compensation to employees disabled by diseases or abnormal conditions of human beings *the causative origin of which was occupational in nature*, the legislature adopted in 1935 what is now codified as G.S. 97-52 and -53.

The words "arising out of" refer to the origin or cause of the accidental injury or occupational disease. *Bartlett v. Duke University*, 284 N.C. 230, 200 S.E. 2d 193 (1973); *Robbins v. Nicholson*, 281 N.C. 234, 188 S.E. 2d 350 (1972); *Taylor v. Twin City Club*, 260 N.C. 435, 132 S.E. 2d 865 (1963); *Guest v. Iron and Metal Co.*, 241 N.C. 448, 85 S.E. 2d 596 (1955); *Duncan v. Charlotte*, 234 N.C. 86, 66 S.E. 2d 22 (1951); G.S. 97-52; G.S. 97-54.

The words "in the course of" refer to the time, place and circumstances under which the injury by accident, or disablement resulting from an occupational disease, occurred. *Bartlett v. Duke University, supra; Robbins v. Nicholson, supra.*

The foregoing legal principles demonstrate that the inquiry here is to determine whether, and to what extent, plaintiff is incapacitated by that part of her chronic obstructive lung disease caused by her occupation to earn, in the same or any other employment, the wages she was receiving at the time she became disabled. It is overwhelmingly apparent that disability resulting from an accidental injury, or disablement resulting from an occupational disease, as the case may be, must arise out of and in the course of the employment, *i.e.*, there must be some causal relation between the injury and the employment before the resulting disability or disablement can be said to "arise out of" the employment.

What, then, must a plaintiff show to be entitled to compensation for disablement resulting from an occupational disease covered by G.S. 97-53(13)? The answer is: She must establish (1) that her disablement *results from an occupational disease* encompassed by G.S. 97-53(13), *i.e.*, an occupational disease due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment as distinguished from an ordinary disease of life to which the general public is equally exposed outside of the employment; and (2) the extent of the disablement *resulting from* said occupational disease, *i.e.*, whether she is totally or partially disabled *as a result of the disease*. If the

disablement resulting from the occupational disease is total, the claimant is entitled to compensation as provided in G.S. 97-29 for total disability. If the disablement resulting from the occupational disease is partial, the claimant is entitled to compensation as provided in G.S. 97-30 for partial disability. To be compensable under the Workers' Compensation Act, an injury must result from an accident arising out of and in the course of the employment. G.S. 97-2(6). Claimant has the burden of showing such injury. *Henry v. Leather Co., supra.* That means, in occupational disease cases, that disablement of an employee resulting from an occupational disease which arises out of and in the course of the employment, G.S. 97-52 and G.S. 97-2(6), is compensable and claimant has the burden of proof "to show not only . . . disability, but also its degree." *Hall v. Chevrolet Co.,* 263 N.C. 569, 575, 139 S.E. 2d 857, 861 (1965).

When the statutory law of North Carolina is applied to the evidence in this case, the conclusion is inescapable that claimant's disablement resulting from the occupational disease does not exceed 50 to 60 percent and that the remaining 40 to 50 percent of her disability results from bronchitis, phlebitis, varicose veins, diabetes, and that part of her chronic lung disease not caused by her occupation. These ailments were in no way caused, aggravated or accelerated by the occupational disease. The Industrial Commission so found, with overwhelming evidence to support the findings. The Commission did precisely what the law of this State required it to do. It had no legal authority to award the claimant compensation for total disability when 40 to 50 percent of her disablement was not occupational in origin and was not aggravated or accelerated by any occupational disease.

To be compensable, any incapacity to earn wages, resulting either from an injury by accident arising out of and in the course of the employment or from an occupational disease, must spring from the employment. "This rule of causal relation is the very sheet anchor of the Workmen's Compensation Act. It has kept the Act within the limits of its intended scope,—that of providing compensation benefits for industrial injuries, rather than branching out into the field of general health insurance benefits." *Duncan v. Charlotte,* 234 N.C. 86, 91, 66 S.E. 2d 22, 25 (1951).

When the General Assembly, by the amendment in 1935, extended the scope of the Act to include a specified list of occupa-

tional diseases which are the usual and natural incidents of particular types of employment, the amendment "in nowise relaxed the fundamental principle which requires proof of causal relation between injury and employment. And nonetheless, since the adoption of the amendment, may an award for an occupational disease be sanctioned unless it be shown that the disease was incident to or the result of the particular employment in which the workman was engaged." *Duncan v. Charlotte, supra,* 234 N.C. at 91, 66 S.E. 2d at 25; *accord, Blassingame v. Asbestos Co.,* 217 N.C. 223, 7 S.E. 2d 478 (1940); *Tindall v. Furniture Co.,* 216 N.C. 306, 4 S.E. 2d 894 (1939). Proof of causation required to establish a compensable claim under G.S. 97-53(13) is a limitation "which protects our Workmen's Compensation Act from being converted into a general health and insurance benefit act." *Booker v. Medical Center,* 297 N.C. 458, 475, 256 S.E. 2d 189, 200 (1979). Additionally, to be compensable under G.S. 97-53(13), an occupational disease must be "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment," and it cannot be "ordinary diseases of life to which the general public is equally exposed outside of the employment." These requirements are specified by the statute itself. *Accord, Booker v. Medical Center, supra.*

The findings of the Commission are supported by competent evidence and are therefore conclusive. They establish the necessary causal relationship of only 55 percent of Mrs. Morrison's inability to work and earn wages. This was the extent of her disability *resulting from* an occupational disease. The incapacity for work resulting from the occupational disease is therefore partial and compensation should be awarded pursuant to G.S. 97-30. The remaining 45 percent of her incapacity is not the responsibility of nor a compensation obligation of her employer under our Workers' Compensation Act which compels industry "to take care of its own wreckage." *Barber v. Minges,* 223 N.C. 213, 216, 25 S.E. 2d 837, 839 (1943). Mrs. Morrison's chronic obstructive lung disease *not* due to cotton dust exposure is not "industry's wreckage." Neither is her phlebitis, varicose veins nor diabetes.[3]

3. Alternate sources of benefits exist for those infirmities which are totally unrelated to employment. An employer or employee or both together may obtain private long- or short-term disability insurance programs to cover these illnesses

Morrison v. Burlington Industries

The law we apply today departs from neither statute nor case precedent. *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951), first adopted for North Carolina the principle of compensation for aggravation and acceleration of a pre-existing infirmity. It mandates a causal connection between the injury or disease and the employment. In *Anderson*, we held:

> While there seems to be no case on the specific point in this State, courts in other jurisdictions hold with virtual uniformity that when an employee afflicted with a pre-existing disease or infirmity suffers a personal injury by accident arising out of and in the course of his employment, and such injury materially accelerates or aggravates the pre-existing disease or infirmity and thus proximately contributes to the death or disability of the employee, the injury is compensable, even though it would not have caused death or disability to a normal person.

233 N.C. at 374, 64 S.E. 2d at 267. In *Anderson*, the employee slipped and fell under compensable conditions wrenching his back. The employee suffered from a congenital infirmity of the spine which impaired his back's normal functioning and subjected it to injury more easily. The employee's physician was of the opinion that he had a "permanent physical disability" of 10 percent and that his disability "could be the result of the last injury received [on the job] or could have arisen before that time." The Commis-

---

not caused, aggravated or accelerated by occupational conditions. Such terms are standard in group life and accident insurance policies. Also, disability benefits are available under the Social Security System. The record indicates application by Mrs. Morrison for benefits from both of these sources. The Social Security disability benefits which Mrs. Morrison receives would be substantially reduced by a workers' compensation award. The Social Security Act requires an offset of Social Security benefits for workers' compensation benefits received. 42 U.S.C. § 424a (1976), 20 C.F.R. §§ 404-408. A reduction in Mrs. Morrison's Social Security benefits must be made for any month before she attains age 62 to fully or partially offset a periodic workers' compensation benefit received for the same month. The amount of the reduction is the amount by which the total Social Security benefits plus the workers' compensation exceeds the higher of two limits: 80 percent of "average current earning" as defined for Social Security purposes, or the family's total Social Security benefits. *See* McCormick, Social Security Claims and Procedures § 403 (1978). The offset applies even where the benefits under Social Security and workers' compensation are paid for different disabilities. *Kananen v. Matthews*, 555 F. 2d 667 (8th Cir.), *cert. den.*, 434 U.S. 939, 54 L.Ed. 2d 298, 98 S.Ct. 429 (1977). Social Security disability is supposed to provide compensation for disabilities not caused, aggravated or accelerated by the work environment. Workers' compensation benefits are not so designed.

sion denied the employee any award on the basis that he had not suffered a compensable injury by accident. On appeal the employee contended that the Commission improperly rejected his argument that if his back injury accelerated or aggravated his pre-existing spinal infirmity in such a way that proximately contributed to his permanent partial disability he would be entitled to compensation. This Court recognized the validity of the employee's argument. It concluded, however, that the Commission did not reject the argument but simply found that plaintiff had not sustained a compensable injury. In the present case, Mrs. Morrison's argument that the work environment caused her lung disease was accepted *in part* by the Commission. The Commission did not accept her contention that it caused all of her lung disease or that her occupation in any way affected her other infirmities. In fact, the Commission specifically found that her occupation did not cause, aggravate or accelerate her other diseases and infirmities which cause 45 percent of her incapacity to work and earn wages.

To like effect is *Little v. Food Service*, 295 N.C. 527, 246 S.E. 2d 743 (1978). In that case we said:

The relevant inquiry under G.S. 97-29 is not whether all or some persons with plaintiff's degree of injury are capable of working and earning wages, but whether plaintiff herself has such capacity. In *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951), Justice Ervin, writing for the Court, noted: "While there seems to be no case on the specific point in this State, courts in other jurisdictions hold with virtual uniformity that when an employee afflicted with a pre-existing disease or infirmity suffers a personal injury by accident arising out of and in the course of his employment, and such injury materially accelerates or aggravates the pre-existing disease or infirmity and thus proximately contributes to the death or disability of the employee, the injury is compensable, even though it would not have caused death or disability to a normal person." Similarly, if other pre-existing conditions such as an employee's age, education and work experience are such that an injury causes him a greater degree of incapacity for work than the same injury would cause some other person, the employee must be compensated for the incapacity which he or she suffers, and not for the degree

of disability which would be suffered by someone with superior education or work experience or who is younger or in better health.

295 N.C. at 531-32, 246 S.E. 2d at 746.

In *Little*, the evidence shows that plaintiff, an over-fifty, obese, uneducated woman, tripped over a mop and fell in a sitting position, resulting in injury to her spinal cord. One doctor rated her physical disability at 50 percent and was of the opinion that she was wholly incapable of resuming her former employment as a laborer. A second doctor was of the opinion that she had suffered an injury to her spinal cord in the neck area; that she had a pre-existing arthritic condition in her neck which was activated by her fall; and that she had suffered a 40 percent disability to the neurological system. The medical evidence further indicated that the injury to Mrs. Little's spinal cord had resulted in weakness "in all of her extremities" and numbness or loss of sensation "throughout her body"; that she had suffered diminished mobility and had difficulty recognizing objects by feeling of them.

The Industrial Commission found that Mrs. Little had suffered "a permanent partial disability of 45 percent . . . loss of use of her back" and awarded compensation for 135 weeks pursuant to G.S. 97-31(23). The Court of Appeals affirmed. We reversed, holding that the Commission could not limit plaintiff to an award under G.S. 97-31(23) because the fall had apparently caused some unspecified loss of use of both arms and both legs and possibly disabling impairments compensable under other sections of the Act. We remanded for further proceedings saying: "The injured employee is entitled to an award which encompasses all injuries received in the accident." 295 N.C. at 531, 246 S.E. 2d at 746.

The *Little* decision mandates the payment of compensation for all disability *caused by the work-related accident*. Our holding in *Little* is sound and does not support claimant's contention in this case. Mrs. Little had no pre-existing, nonoccupational diseases or infirmities that caused any percentage of her incapacity for work. We *know* that all of Mrs. Little's incapacity for work, whether total or partial, *was caused by the fall*. With respect to Mrs. Morrison, we know that 45 percent of her incapacity for work was not caused, aggravated, or accelerated by an occupational disease or by her exposure to cotton dust during the course

of her employment because the Commission so found upon overwhelming evidence to that effect.

It would serve no useful purpose to engage in a detailed discussion of many confusing and conflicting decisions from other jurisdictions because, for the most part, they are based on statutes and interpretations thereof quite different from our own. It suffices to say that we are not bound by the law of other states. "The decisions from other jurisdictions, while helpful in construing the provisions of our statute, are not controlling; neither is the interpretation placed upon a statute similar to ours, binding on this Court." *Stanley v. Hyman-Michaels Co.*, 222 N.C. 257, 266, 22 S.E. 2d 570, 576 (1942). The result we reach is consistent with the principle that our Workers' Compensation Act is not, and was never intended to be, a general accident and health insurance law. Such was not the legislative intent and we should not, by judicial legislation, convert our compensation law into a system of compulsory general health insurance.

In summary: (1) an employer takes the employee as he finds her with all her pre-existing infirmities and weaknesses. (2) When a pre-existing, *nondisabling, non-job-related* condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment or by an occupational disease so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent. (3) On the other hand, when a pre-existing, nondisabling, non-job-related disease or infirmity eventually causes an incapacity for work without any aggravation or acceleration of it by a compensable accident or by an occupational disease, the resulting incapacity so caused is not compensable. (4) When a claimant becomes incapacitated for work and part of that incapacity is caused, accelerated or aggravated by an occupational disease and the remainder of that incapacity for work is not caused, accelerated or aggravated by an occupational disease, the Workers' Compensation Act of North Carolina requires compensation only for that portion of the disability caused, accelerated or aggravated by the occupational disease.

Our Workers' Compensation Act, as enacted by the legislature and interpreted and applied by this Court, will not support a recovery by Mrs. Morrison for total disability. It is our

duty to interpret the Act as it exists. This Court is not philosophically opposed to the result sought by Mrs. Morrison, but expansion of the law to permit such recovery is the legislature's prerogative, not ours.

For the reasons stated the decision of the Court of Appeals is reversed. The case is remanded to that court for further remand to the Industrial Commission for reinstatement of its award based on its findings and conclusions following our remand order dated 23 October 1980 and appearing in 301 N.C. 226, 271 S.E. 2d 364 (1980).

Reversed and remanded.

Justice EXUM dissenting.

Believing that the majority has misunderstood the evidence and refused to recognize the appropriate legal principles which govern this case, I dissent. The Court of Appeals' majority reached the right result and I vote to affirm its decision that Mrs. Morrison is entitled to an award for total incapacity for work.

The evidence, properly understood, shows that although Mrs. Morrison suffered from several physical infirmities unrelated to her job[1] before the onset of her chronic obstructive lung disease (hereinafter "lung disease"), none of these infirmities standing alone had ever kept her from working. She continued to work despite these infirmities until her lung disease progressed to such a severe state that because of it she was no longer able to work. Her incapacity for work, therefore, was caused entirely by her lung disease.[2]

---

1. These were found by the Commission in Finding 6 to be "phlebitis, varicose veins and diabetes" and in Finding 8 to be "bronchitis, phlebitis, varicose veins and diabetes."

2. All three physicians so testified at the hearings conducted after our remand order: Dr. Sieker testified, "Mrs. Morrison, in my opinion, is totally disabled, physically disabled for all but the most sedentary type of work. . . . The chronic obstructive lung disease is the reason this lady is disabled. Her diabetes, varicose veins, sinusitis, rhinitis, none of these would disable her in any way."

Dr. Battigelli said that plaintiff's infirmities other than her chronic pulmonary lung disease could "possibly" have contributed to her disability. He did, however,

There is some evidence adduced at the hearing *before* our remand order that Mrs. Morrison's total incapacity for work was due to the combined effects of, or interaction between, her lung disease and those physical infirmities which pre-existed the onset of this disease. All the evidence shows, however, that before the onset of her lung disease those pre-existing infirmities had caused no incapacity for work whatever.

There is no evidence that these physical infirmities contributed to her incapacity for work, even in combination with her lung disease, to the extent of 45 percent of her incapacity. No physician or lay witness so testified. The only evidence of a 45 percent-55 percent dichotomy comes from the testimony of Dr. Sieker. Dr. Sieker testified that there were "two identifiable etiologic factors" which contributed to Mrs. Morrison's chronic obstructive lung disease. "One is cotton dust exposure, the other is her cigarette consumption." He said, "[I]n a somewhat arbitrary way but with clinical judgment I assigned the etiologic factors about 50 percent—50 to 60 percent for the cotton dust exposure and 40 to 50 percent for the cigarette smoking and any attendant problems with that. . . . At the present time there is no laboratory type of test that would do this. This [assignment of etiological factors] had to be based on the judgment, one's judgment of the effects of these agents on the respiratory system. . . . In general cigarette smoking will make an individual more susceptible to any other air pollutant and one would expect that cigarette smoking and cotton dust exposure would have the synergistic effect."

The majority claims additional testimony by Dr. Sieker supports the Commission's Finding 5. The Commission found that:

concede, on cross-examination "that to the extent [Mrs. Morrison] is disabled at all, it is exclusively as a result of her lung disease and cotton dust exposure to a total of 20 percent."

Dr. Mabe testified that "the reason for [Mrs. Morrison's] medical disability was . . . her pulmonary disease . . . it was not influenced by her phlebitis. . . . She had had a phlebitis. She got over it. She had some more problems with it. But that would have been a short term type thing. She could have worked on with the phlebitis."

Indeed the Commission's Finding 5 states: "Dr. Sieker examined plaintiff January 18, 1977. On that date, plaintiff suffered from chronic obstructive lung disease, and, according to Dr. Sieker, was unable to engage in gainful employment *because of chronic obstructive lung disease.*"

"In Dr. Sieker's opinion, fifty percent to sixty percent of plaintiff's incapacity for work resulting from chronic obstructive lung disease was caused by exposure to cotton dust during the course of her employment at Burlington Industries, while the balance (forty percent to fifty percent) of her incapacity for work resulting from chronic obstructive lung disease was due to diseases and conditions which were not caused, aggravated, or accelerated by exposure to cotton dust during the course of her employment at Burlington Industries."

It is true that Dr. Sieker stated in one portion of his testimony that it was his clinical judgment "that 50 to 60 percent of that disability can be related to her cotton dust exposure." It is clear, however, when this bit of testimony is read in context, that Dr. Sieker meant 50 to 60 percent of Mrs. Morrison's lung disease, not her total incapacity, is attributable to cotton dust exposure and 40 to 50 percent to cigarette smoking. Similarly, no testimony by any other physician or lay witness supports the finding that 45 percent of Mrs. Morrison's total incapacity for work was caused by her physical infirmities apart from or together with her lung disease. This point is worthy of repetition because it is crucial for a proper analysis of this case. Dr. Sieker testified that *all of Mrs. Morrison's incapacity for work was caused by her lung disease.* It was the *lung disease*, not her incapacity, that had two causes. These causes were her exposure to cotton dust and cigarette smoking, and their proportionate contribution to her lung disease were: (1) 50-60 percent caused by her exposure to cotton dust, and (2) 40-50 percent caused by her cigarette smoking.

The legal issue in this case is obfuscated because of ambiguity in the Commission's findings. This ambiguity persists in the majority opinion. One interpretation of both the findings and the majority opinion is that Mrs. Morrison's physical infirmities other than her lung disease have, when combined or after interacting with her lung disease, contributed to the extent of 45 percent to her incapacity for work, and the lung disease itself to the extent of 55 percent.[3] Findings 6 and 8 seem to establish this dichotomy

3. I do not understand either the majority or the Commission to say that these other physical infirmities *standing alone* had or would have produced any incapacity for work. There is, as I have already noted, no evidence to support this notion of the case.

Morrison v. Burlington Industries

between the lung disease on one hand and her other physical infirmities on the other:

> "6. In addition to her chronic obstructive lung disease, plaintiff suffers and has suffered from time to time with phlebitis, varicose veins and diabetes. Such conditions constitute an added factor in causing her incapacity for work, and were not caused, aggravated, or accelerated by exposure to cotton dust during the course of her employment at Burlington Industries.
>
> . . . .
>
> "8. *Due to the chronic obstructive lung disease suffered by plaintiff, and due to her other physical infirmities, including bronchitis, phlebitis, varicose veins and diabetes, plaintiff has no earning capacity in any employment for which she can qualify in the labor market.*"

Another interpretation is that only 55 percent of Mrs. Morrison's lung disease is caused by her exposure to cotton dust and 45 percent by cigarette smoking.[4] Therefore even though the lung disease has caused Mrs. Morrison to be totally incapacitated for work, she is entitled to an award as if she were only 55 percent incapacitated, the percentage being based on the extent to which

---

4. Although it is not entirely clear I assume this is what the Commission and the majority mean when they refer to "that part" of Mrs. Morrison's lung disease which is not related to her employment. I find nothing else in the evidence, other than the cigarette smoking, which could constitute "that part" of Mrs. Morrison's lung disease unrelated to her employment. The only possible candidate would be Mrs. Morrison's bronchitis. The Commission, however, did not find the bronchitis to be a component of the chronic obstructive lung disease. It found it to be one of Mrs. Morrison's physical infirmities *other than* her lung disease. *See* Finding 8. The majority so treats the bronchitis when it says, "When the statutory law of North Carolina is applied to the evidence in this case, the conclusion is inescapable that claimant's disablement resulting from the occupational disease does not exceed 50 to 60 percent and that the remaining 40 to 50 percent of her disability results from bronchitis, phlebitis, varicose veins, diabetes, and that part of her chronic lung disease not caused by her occupation." Even if the bronchitis were a component of her lung disease, her award should not be diminished because of it. Because it would then be a pre-existing condition clearly aggravated by her occupational exposure to cotton dust under the "aggravation" principle recognized by the majority.

the cotton dust exposure contributed to, or was an etiological fac-
tor in, the development of her lung disease.[5]

If the first interpretation of the Commission's finding is the
basis for its award and the majority's decision, then both are in
error simply because, as I have already shown, there is no
evidence to support this interpretation. Even if there were such
evidence, then under either interpretation Mrs. Morrison is legal-
ly entitled to an award compensating her for the total incapacity
for work from which she actually suffers. The fundamental legal
errors committed by the majority are: first, its position that
unless an occupational disease medically aggravates or ac-
celerates some pre-existing condition, it must be the *sole* cause of
a worker's incapacity for work in order for the worker to be com-
pensated for the full extent of the incapacity, and second, its posi-
tion that occupational conditions must be the *sole* cause of an
occupational disease in order for a worker to be compensated for
the full extent of the incapacity for work caused by the disease.
Part I of this dissent will address the majority's first position and
Part II, its second.

---

5. Interestingly, this ambiguity did not find its way into the Commission's find-
ings until after the hearings and evidence adduced pursuant to our remand order.
In the Commission's pre-remand order it found:

> "6. In addition to her chronic obstructive lung disease, plaintiff suffers
> and has suffered for some time from phlebitis, varicose veins and diabetes.
> Such conditions constitute an added factor in causing her disability.

> "7. *Plaintiff suffers from chronic obstructive lung disease, an occupa-
> tional disease due to causes and conditions characteristic of and peculiar to
> her particular trade, occupation or employment in the textile industry. Her
> disease is not an ordinary disease of life to which the general public is equally
> exposed outside of such employment.*

> "8. Due to the occupational disease suffered by plaintiff and due to her
> other physical infirmities, including bronchitis, phlebitis, varicose veins and
> diabetes, plaintiff has no earning capacity in any employment for which she
> can qualify in the labor market. *Fifty-five percent of such disability is due to
> her occupational disease and 45 percent of such disability is due to her
> physical infirmities not related to her employment with defendant-employer.*"
> (Emphasis supplied.)

After hearing further evidence pursuant to our remand order, all of which tended
to show that whatever incapacity for work Mrs. Morrison suffered, it was entirely
due to her lung disease, *see* note 2, *supra*, the Commission then couched its findings
and conclusions in terms of a chronic obstructive lung disease which was caused
only "in part" by Mrs. Morrison's exposure to cotton dust.

I

An occupational disease need not be the sole cause of a worker's incapacity for work in order for the worker to be compensated to the full extent of such incapacity. If an occupational disease combines or interacts with certain pre-existing physical infirmities so as to render the worker totally incapacitated for work, our statutes permit an award for total incapacity where, as here, the pre-existing, non-job-related physical infirmities *in themselves* and absent the occupational disease, are insufficient to cause any incapacity for work. Typically, in these kinds of cases the worker suffers from various physical or other kinds of infirmities but, despite them, is able to and does continue to work. He is not at this point disabled in the compensation sense.[6] The worker then contracts an occupational disease or suffers a compensable injury[7] which renders him incapacitated for work. If the worker had been perfectly healthy, the disease may have rendered him only partially incapacitated. Because, however, of certain infirmities which pre-existed the onset of the disease, the disease in combination or interaction with these infirmities produces total incapacity for work. In such cases the law in this and all other jurisdictions with statutes like ours is and should be that the worker receives an award for total incapacity. Because in such cases the occupational disease is truly the precipitating cause of the worker's entire incapacity for work; it is the cause without which the incapacity would not have occurred. Said another way, it is the cause without which the worker would have had full capacity for work.

Neither must the worker in such cases, contrary to the majority's assertion, show that the occupational disease is medically related to his pre-existing infirmities or that these infirmities have somehow been medically aggravated by the disease. The question is not how the occupational disease and the other infir-

6. Disability in the compensation sense is defined in G.S. 97-2(9) as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." Furthermore compensation under G.S. 97-29 and G.S. 97-30 is awarded not for disability but for "the incapacity for work."

7. "Disablement . . . resulting from an occupational disease" is treated the same for compensation purposes as the happening of an injury by accident. G.S. 97-52; *Woods v. Stevens & Co.*, 297 N.C. 636, 256 S.E. 2d 692 (1979).

mities are medically connected. The question is how they are con-
nected vis-a-vis the worker's capacity to work. This is the true
meaning of the aggravation principle, recognized but wrongly
restricted by the majority to aggravation in a medical sense. The
aggravation principle means, as the cases demonstrate, that if the
occupational disease, in combination or interaction with pre-
existing infirmities not in themselves sufficient to cause any in-
capacity for work, so aggravates the worker's physical condition
that he is then totally incapacitated for work, he is entitled to an
award for total incapacity.

It is this principle, not the majority's restricted understand-
ing of the aggravation principle, that governs this case under the
interpretation of the Commission's findings now being discussed.
Professor Larson notes that "[n]othing is better established in
compensation law" than this principle. He says, 2 Larson, Work-
men's Compensation Law § 59.22 (1981) (herein "Larson"):

> "Apart from special statute, apportionable 'disability' does
> not include a prior non-disabling defect or disease that con-
> tributes to the end result. Nothing is better established in
> compensation law than the rule that, when industrial injury
> precipitates disability from a latent prior condition, such as
> heart disease, cancer, back weakness and the like, the entire
> disability is compensable, and except in states having special
> statutes on aggravation of disease, no attempt is made to
> weigh the relative contribution of the accident and the pre-
> existing condition to the final disability or death. Apportion-
> ment does not apply in such cases, nor in any case in which
> the prior condition was not a disability in the compensation
> sense. . . . Of course, the matter is entirely different if the
> degenerative condition is itself the cause of the disability for
> which compensation is claimed, quite apart from the effect of
> the industrial accident. Thus, it may be found on the facts of
> a particular case that after the period of temporary disability
> caused by the accident was completed, any subsequent long-
> range disability stemmed entirely from a pre-existing infirmi-
> ty.
>
> "The essential distinction at stake here is between a pre-
> existing disability that independently produces all or part of
> the final disability, and the pre-existing condition that in

some way combines with or is acted upon by the industrial injury. . . . It will be observed that the courts in these cases define pre-existing disability, not as a functional disability, but as a disability in the compensation sense of impairment of earning capacity.

"To be apportionable, then, an impairment must have been independently producing some degree of disability before the accident, it must be continuing to operate as a source of disability after the accident."

Our cases support these principles. In *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951), the employee slipped and fell under compensable conditions wrenching his back. The employee suffered from a congenital infirmity of the spine which impaired his back's normal function and subjected it to injury more easily. The employee's physician was of the opinion that he had a "permanent physical disability" of 10 percent and that his disability "could be the result of the last injury received [on the job] or could have arisen before that time." The Commission denied the employee any award on the basis that he had not suffered a compensable injury by accident. On appeal the employee contended that the Commission improperly rejected his argument that if his work-related back injury aggravated his pre-existing spinal infirmity in such a way that it contributed to his permanent partial disability he would be entitled to compensation. This Court recognized the validity of the employee's argument. It concluded, however, that the Commission did not reject the argument but simply found that plaintiff had not sustained a compensable injury. The Court interpreted the findings of the Full Commission to mean, *id.* at 375, 64 S.E. 2d at 267:

"Although the plaintiff suffered a personal injury by accident arising out of and in the course of his employment on 7 March, 1949, such injury was inconsequential in nature, and did not, either of itself or *in combination with* the pre-existing infirmity of the plaintiff, cause any disability, i.e., loss of wage-earning power, to the plaintiff." (Emphasis supplied.)

As noted by the majority, *Anderson* also adopted for the first time in North Carolina the aggravation principle in the following language, *id.* at 374, 64 S.E. 2d at 267:

"While there seems to be no case on the specific point in this State, courts in other jurisdictions hold with virtual uniformity that when an employee afflicted with a pre-existing disease or infirmity suffers a personal injury by accident arising out of and in the course of his employment, and such injury materially accelerates or aggravates the pre-existing disease or infirmity and thus proximately contributes to the death or disability of the employee, the injury is compensable, even though it would not have caused death or disability to a normal person."

Even if the occupational injury did medically aggravate a pre-existing spinal infirmity in *Anderson,* there is no suggestion in the opinion that the aggravation principle should be limited to this kind of connection. Indeed the Court in *Anderson* denied the worker any award not only because it concluded there was no aggravation of the pre-existing condition, but also because the work-related fall "did not, either of itself *or in combination with* the pre-existing infirmity . . . cause any . . . loss of wage-earning power." *Id.* at 375, 64 S.E. 2d at 267. (Emphasis supplied.)

*Little v. Food Service,* 295 N.C. 527, 246 S.E. 2d 743 (1978), strongly supports the proposition that under our Workers' Compensation Act an employee who is totally incapacitated for work must be compensated, if at all, for total incapacity under G.S. 97-29 notwithstanding that the total incapacity might be due to the combined effects of non-job-related infirmities and an industrial accident. Ms. Little was injured under compensable circumstances by a fall over a mop bucket which resulted in significant injury to her spinal cord in the mid-cervical region. Medical evidence showed that she had a fifty percent disability with reference to her "total life function" and a "40 percent disability to the neurological system." The Full Commission found that Ms. Little suffered "an average permanent partial disability of 45% or loss of use of her back." Accordingly, it awarded compensation for 135 weeks pursuant to G.S. 97-31(23).[8]

The evidence, however, also tended to show that Ms. Little was over fifty years old, obese, with an eighth grade education,

---

8. Under this section of the Workers' Compensation Act, Ms. Little would have been entitled to compensation for 300 weeks "for the total loss of use of" her back.

and had been working as a laborer earning less than $2.00 per hour. The injury to her spinal cord resulted in weakness in her extremities and numbness throughout her body. Noting that this additional evidence was uncontradicted, this Court reversed and remanded for further proceedings on the ground that Ms. Little's injury on the job combined with her non-job-related infirmities might well qualify her for an award of total incapacity under G.S. 97-29. This Court said, in an opinion by Justice Huskins, 295 N.C. at 531-32, 246 S.E. 2d at 746:

> "*The relevant inquiry under G.S. 97-29 is not whether all or some persons with plaintiff's degree of injury are capable of working and earning wages, but whether plaintiff herself has such capacity.* In *Anderson v. Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951), Justice Ervin, writing for the Court, noted: 'While there seems to be no case on the specific point in this State, courts in other jurisdictions hold with virtual uniformity that when an employee afflicted with a pre-existing disease or infirmity suffers a personal injury by accident arising out of and in the course of his employment, and such injury materially accelerates or aggravates the pre-existing disease or infirmity and thus proximately contributes to the death or disability of the employee, the injury is compensable, even though it would not have caused death or disability to a normal person.' *Similarly, if other pre-existing conditions such as an employee's age, education and work experience are such that an injury causes him a greater degree of incapacity for work than the same injury would cause some other person, the employee must be compensated for the incapacity which he or she suffers, and not for the degree of disability which would be suffered by someone with superior education or work experience or who is younger or in better health.* See A. Larson, Workmen's Compensation § 57.52, at nn. 96-97 (1976), and cases collected therein." (Emphasis supplied.)

The Court also said, 295 N.C. at 533, 246 S.E. 2d at 747:

> "So the ultimate question remains: To what extent is plaintiff now able to earn, in the same or any other employment, the wages she was receiving at the time of her injury? If she is unable to work and earn *any* wages, she is totally

disabled. G.S. 97-2(9). In that event, unless all her injuries are included in the schedule set out in G.S. 97-31, she is entitled to an award for permanent total disability under G.S. 97-29.

. . . .

"If she is able to work and earn *some* wages, but less than she was receiving at the time of her injury, she is partially disabled. G.S. 97-2(9). In that event she is entitled to an award under G.S. 97-31 for such of her injuries as are listed in that section, and to an additional award under G.S. 97-30 for the impairment of wage earning capacity which is caused by any injuries *not listed* in the schedule in G.S. 97-31." (Emphasis original.)

There was, of course, no medical connection between the injuries Ms. Little suffered in her work-related fall and her pre-existing advanced age, obesity, and limited education. Yet this Court, expressly employing the aggravation principle announced in *Anderson*, concluded that Ms. Little was entitled to be compensated for whatever incapacity for work she suffered by reason of the combined effects of her injuries suffered in her work-related fall and these other pre-existing conditions.

The Court of Appeals has expressly so held in *Mabe v. Granite Corp.*, 15 N.C. App. 253, 189 S.E. 2d 804 (1972), a case involving an occupational disease. Mabe had worked as a stonecutter for defendant for 30 to 35 years. He left work in 1968 and subsequently filed claim for disability caused by silicosis. The Advisory Medical Committee for the Industrial Commission was of the opinion that the employee was "40% disabled from employment in his previous or any other occupation." The employee's own testimony tended to show that because of shortness of breath and lack of strength he could not perform hard labor and that because of his lack of education and illiteracy he was qualified to do nothing but hard labor. He had not, therefore, had regular employment since 1968 when he left his stonecutter's job. The Full Commission awarded the employee compensation for total disability in accordance with G.S. 97-61.6 and G.S. 97-29.[9]

9. G.S. 97-61.6 provides that "where the incapacity for work resulting from asbestosis or silicosis is found to be total, the employer shall pay . . . compensation in accordance with G.S. 97-29."

The Court of Appeals affirmed against defendant's contention that the employee would not be totally disabled to work were it not for the contributing factors of his age and poor education, both of which were beyond the employer's control. The Court of Appeals answered this contention by saying, 15 N.C. App. at 255-56, 189 S.E. 2d at 806-07:

"The question is what effect has the disease had upon the earning capacity of this particular plaintiff; not what effect a like physical impairment would have upon an employee of average age and intelligence.

"The answer [to defendant's contention] is that an employer accepts an employee as he is. If a compensable injury precipitates a latent physical condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable and no attempt is made to weigh the relative contribution of the accident and the pre-existing condition. 2 Larson, Workmen's Compensation Law, § 59.20, p. 88.109. By the same token, *if an industrial disease renders an employee actually incapacitated to earn any wages, the employer may not ask that a portion of the disability be charged to the employee's advanced age and poor learning on the grounds that if it were not for these factors he might still retain some earning capacity.*" (Emphasis supplied.)

The principle governing this case was applied in *Pruitt v. Knight Publishing Co.*, 27 N.C. App. 254, 218 S.E. 2d 876 (1975), *rev'd on other grounds*, 289 N.C. 254, 221 S.E. 2d 355 (1979). There a worker had suffered a work-related back injury on 30 November 1972. In 1961 he had also suffered a back injury in an automobile accident. Dr. J. L. Goldner had treated him for both injuries. At the compensation hearing, Dr. Goldner testified that plaintiff had a 35 percent permanent partial disability of the spine with 25 percent attributable to the pre-existing automobile injury and 10 percent attributable to the later work-related injury. The Commission gave Mr. Pruitt an award based on a 10 percent permanent disability of his back. The Court of Appeals reversed and held that Mr. Pruitt was entitled to an award based on a 35 percent disability of his back. The Court of Appeals, in an opinion by Judge, now Justice, Britt, 27 N.C. App. at 256-59, 218 S.E. 2d at 878-80, correctly set out the governing principles as follows:

"In cases covered by our Workmen's Compensation Act, disability is not a term of art but a creature of statute. G.S. 97-2(9) provides: 'The term "disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment.' Thus we see that disability is defined in terms of a diminution in earning power. It is more than mere physical injury and is markedly different from technical or functional disability. *Anderson v. Northwestern Motor Co.*, 233 N.C. 372, 64 S.E. 2d 265 (1951). Our Supreme Court has described disability as the event of being incapacitated from the performance of normal labor. *Watkins v. Central Motor Lines*, 279 N.C. 132, 181 S.E. 2d 588 (1971); *Hall v. Chevrolet, Inc.*, 263 N.C. 569, 139 S.E. 2d 857 (1965).

"An employer takes his employees as he finds them. *Mabe v. North Carolina Granite Corp.*, 15 N.C. App. 253, 189 S.E. 2d 804 (1972). *See, e.g., Edwards v. Publishing Co.*, 227 N.C. 184, 191, 41 S.E. 2d 592, 594 (1947) (Concurring opinion of Seawell, J.). *Each employee brings to the job his own particular set of strengths and weaknesses. That one employee is peculiarly disposed to injury because of an infirmity or disease incurred prior to his employment affords no sound basis for a reduction in the employer's liability.* The fact that a person of normal faculties working under the same conditions might not have sustained the same injury to the same degree is immaterial. *Plaintiff was putting forth a full day's work for a full day's pay. There is no evidence that plaintiff's capacity to earn in the course of employment at defendant's printing plant was at all impaired by after-effects of the 1961 automobile accident.*

"The record reveals the 1972 injury as the causal force which transformed latent infirmity into disability within the contemplation of the Workmen's Compensation Act. The force of the earlier injury was spent; the after-effects, both long and short term, had abated to the extent that plaintiff regularly performed heavy manual labor — lifting lead plates — at defendant employer's printing plant. The vulnerative force of the 1972 accident acted directly upon the situs of the earlier injury and surgery, causing, '. . . the impingement of the old fusion on L3 spinous process.' By invading theretofore

unoffending aspects of the earlier injury the accident of defendant's printing plant became the prime cause of plaintiff's disability.

. . . .

"Our act contains no special statute which would authorize apportionment in the instant case.

"*There is a distinction between a preexisting impairment independently producing all or part of a final disability, and a preexisting condition acted upon by a subsequent aggravating injury which precipitates disability. Plaintiff's claim falls in the latter category.*

"Our decision is in accord with the majority, and we think the better, view of those jurisdictions which have spoken on the subject of preexisting infirmities aggravated by subsequent industrial injury. . . . So long as an individual is capable of doing that for which he was hired, then the employer's liability for injury due to industrial accident ought not be reduced due to the existence of a nonincapacitating infirmity.

"There are limited provisions for apportionment of disability under our Workmen's Compensation Law. Pursuant to G.S. 97-33 disability may be apportioned between injuries connected with military service and those sustained in the course of other employment. The Supreme Court has held the policy evinced by this statute is designed to thwart double recoveries. *Schrum v. Upholstering Co.*, 214 N.C. 353, 355, 199 S.E. 385, 387 (1938). G.S. 97-35 also has limited provision for apportionment. Its application is restricted to successive injuries arising out of the same employment, and certain other cases. Neither of these statutes is applicable to the facts of this case where plaintiff received no compensation for his earlier back injury which arose out of a noncompensable automobile accident separate and apart from any employment." (Emphasis supplied.)

On defendant's appeal in *Pruitt* by virtue of Judge Clark's dissent in the Court of Appeals, this Court in an opinion by Justice Huskins agreed with the Court of Appeals' conclusion that our apportionment statutes, G.S. 97-33 through G.S. 97-35, were

inapplicable. This Court viewed the appeal as presenting two determinative questions, 289 N.C. at 257, 221 S.E. 2d at 357:

"1. Is plaintiff bound by the written agreement on I. C. Form 26 dated 6 June 1974, and approved by the Commission, wherein defendants agreed to pay and plaintiff agreed to accept compensation based on a 10 percent partial disability of his back?

"2. Where an employee is paid compensation for a period of temporary total disability caused by a compensable injury which materially aggravated a preexisting 25 percent permanent partial loss of use of the back so that the employee had a 35 percent permanent partial loss of use of the back at the end of the healing period, is the employee entitled to compensation under G.S. 97-31(23) for 10 percent or 35 percent permanent partial loss of use of the back?"

The Court answered the first question in the affirmative and did not consider the second.

Our apportionment statutes have no application to this case. Defendants make no argument based on them.

As with Mr. Pruitt, Mrs. Morrison's infirmities which preexisted the onset of her occupational diseases, while medically significant, physically debilitating, and perhaps functionally disabling, were *not* disabling in the compensation sense because they had not resulted in any incapacity for work. Mrs. Morrison like Mr. Pruitt suffered no incapacity for work until the onset of her chronic obstructive lung disease. It was this lung disease which, in the words of *Pruitt*, "transformed latent infirmity into disability within the contemplation of the Workmen's Compensation Act." 27 N.C. App. at 257, 218 S.E. 2d at 879. The lung disease then was the effective cause, or the precipitating cause, of Mrs. Morrison's total incapacity for work. It was the cause without which Mrs. Morrison would have had no incapacity for work at all. Although there is no medical connection and no medical aggravation between Mrs. Morrison's lung disease and her preexisting physical infirmities, she is totally incapacitated as a result of the combined effects of or the interaction between the disease and these other infirmities. Therefore, under the principles recognized in *Anderson* and applied in *Little, Mabe,* and

*Pruitt,* Mrs. Morrison is entitled to an award for her total incapacity.

Cases throughout the country in jurisdictions with total and partial incapacity statutes similar to G.S. 97-29 and 97-30 and in the absence of special apportionment statutes are in accord with our cases.

In *Sheppard v. Michigan Nat'l Bank,* 348 Mich. 577, 584, 83 N.W. 2d 614, 616 (1957), the Court said:

> "Nothing is better settled in compensation law than that the act takes the workmen as they arrive at the plant gate. Some are weak and some are strong. Some, particularly as age advances, have a pre-existing 'disease or condition' and some have not. No matter. All must work. They share equally the hazards of the press and their families the stringencies of want, and they all, in our opinion, share equally in the protection of the act in the event of an accident, regardless of their prior condition of health."[10]

In *Wadleigh v. Higgins,* 358 A. 2d 531 (Me. 1976), the employee suffered a back injury under compensable circumstances. He also suffered from carcinoma of the larynx, gout, and osteoarthritis of the spinal column. The Maine Industrial Commission found as a fact that the employee "is totally disabled." The Commission, however, also found that only 90 percent of his total disability was attributable to his back injury. It made an award for compensation as in a case of 90 percent partial disability. The Supreme Judicial Court of Maine sustained the employee's appeal and held that he was entitled to compensation for total disability notwithstanding the Commission's finding that 10 percent of his total disability was attributable to conditions other than his back injury. The Maine Court said, 358 A. 2d at 532-33:

> "An employer [must] compensate an employee who is disabled *as a result of the interaction between* a work related

---

10. Michigan statutes provide for payments for "total" incapacity for work and for "partial" incapacity for work where the respective incapacity is one "resulting from" an industrial injury. Mich. Comp. Laws Ann. §§ 418.351 and 418.361. Michigan does, however, *by statute* seem to apportion awards for occupational diseases which aggravate pre-existing non-compensable disabilities. Mich. Comp. Laws Ann. §§ 418.431, 418.535.

injury and a preexisting but non-disabling injury or disease to the full extent of his incapacity even though the injury would not have so extensively disabled a healthy individual. The principle may be seen as a corollary of the oft-stated maxim that the employer takes his employee as he finds him."[11] (Emphasis supplied.)

In *Reynolds v. Ruidoso Racing Ass'n, Inc.*, 69 N.M. 248, 365 P. 2d 671 (1961), the employee suffered a compression fracture of a spinal vertebra under compensable circumstances. Before this injury he had suffered two other fractured vertebra which had satisfactorily healed. He also suffered from osteoporosis, or unusually porous and supple bones. The factfinder found that the employee was totally and permanently disabled "from doing gainful and useful work that he is capable of performing" but that only 10 percent of this disability was due to his compensable back injury, the rest being due to his osteoporosis, the cause of which was unknown. The factfinder, therefore, awarded the employee as if he had been only 10 percent totally disabled. The Supreme Court of New Mexico held that the employee was entitled to compensation for total disability. It recognized that there was no evidence that the compensable back injury aggravated his preexisting bone disease in a medical sense. Rather the physical combination of the back injury and the bone disease resulted in total disability. The Court quoted with approval from 1 Larson § 12.20 (1952), as follows:

"Pre-existing disease or infirmity of the employee does not disqualify a claim under the 'arising out of employment' requirement if the employment aggravated, accelerated, *or combined with* the disease or infirmity to produce the death or disability for which compensation is sought." (Emphasis supplied.)[12]

The court also cited with approval *National Homeopathic Hospital Association of District of Columbia v. Britton*, 147 F. 2d 561 (D.C.

11. Maine's compensation statutes also employ the "resulting from" language in its total and partial incapacity statutes. Me. Rev. Stat. tit. 39, §§ 54 and 55.

12. New Mexico defines the causal relation between an industrial "injury" and total or partial "disability," respectively, as meaning a "condition" whereby a workman, by reason of an [industrial injury] is "wholly unable" or "unable to some percentage-extent" to work. N.M. Stat. Ann. §§ 52-1-24, 52-1-25.

Cir. 1945), where total disability compensation was allowed when a knee-cap fracture incurred under compensable circumstances "combined with" previous fractures and amputations to produce total disability. The New Mexico Court quoted with approval the following language from the District of Columbia Court of Appeals, *Reynolds v. Ruidoso Racing Ass'n, Inc.*, 69 N.M. at 257, 365 P. 2d at 677:

> "In a negligence case, the question is not what the accident would have done to a different man but what it actually did to its victim. This is equally true in compensation cases. Therefore the employer must, in general, compensate the workman for the consequences of an accident although his previous defects *cooperated in producing them.*" (Emphasis original.)

The New Mexico Court also noted that "44 states have second injury funds as a means of answering the dilemma presented by dissatisfaction with rules of full responsibility and the rule of apportionment, New Mexico is one of the six that has never established such a fund." *Id.* at 257-58, 365 P. 2d at 678. This statement referred to states which provide by statute for apportionment of compensation between disability caused in part by industrial accident or disease and in part by other non-job-related conditions, and to states which have special funds established so that these funds together with workers' compensation insurance fully compensate the worker, in any event, under such circumstances.[13]

In *National Zinc Co. v. Hainline*, 360 P. 2d 236 (Okla. 1961), the employee suffered from emphysema. He worked for 21 years in close proximity to zinc processing equipment. The evidence tended to show that breathing fumes from the zinc processing equipment in combination with his pre-existing emphysema had resulted in total disability. The Supreme Court of Oklahoma, however, rejected defendant's argument that the employee should recover only for that part of his disability resulting from

13. *See* 2 Larson §§ 59.21, 59.30 (1981). North Carolina has a second injury fund statute, G.S. 97-40.1. Its application is quite limited. The point has not been argued but it would not appear that the statute has any application in Mrs. Morrison's case.

breathing fumes from the zinc processing equipment. The Court said, 360 P. 2d at 239:

> "It is settled law in this jurisdiction that disability from an accidental injury which aggravates or accelerates a dormant disease is compensable, even though the physical condition of employee pre-disposes him to, or increases, the harm of a particular injury. We can perceive of no valid reason why a different rule should govern a situation, where, as in the instant case, the morbidity from compensable exposure to toxic substances as defined by statute, rather than an accident, augments or accelerates a disease upon which it is superimposed, so as to ultimately produce disability. In both instances *the entire disability arising from the cumulative effect of a compensable harm combined with a non-occupational illness, interacting upon each other and operating together, furnishes the proper basis for an award.*[14] (Emphasis supplied.)

These cases establish the following principles applicable in compensation cases: An employer takes his workers as he finds them with all of their infirmities and weaknesses. In terms of their causal relationship to incapacity for work occupational diseases are treated like industrial accidents. The industrial accident or occupational disease need not be the sole cause of the incapacity for work. It need only be a contributing factor in the sense that it is the effective, or precipitating, cause of the incapacity for work, or a cause without which the incapacity for work would not have occurred. Neither is it necessary that the industrial accident or occupational disease be medically related to, or medically aggravate, the worker's pre-existing infirmities. It is enough if the industrial accident or occupational disease physically combines or interacts with the worker's pre-existing infirmities to produce incapacity for work so long as these pre-existing infirmities are themselves insufficient to cause any incapacity for work. In such cases the award may not be made as if the worker were incapacitated only to the extent of the industrial accident's or occupational disease's contribution. The worker in such cases

---

14. Oklahoma employs the "resulting from" language in its compensation statutes. Okla. Stat. Ann. tit. 85, § 11 (West).

must be compensated to the full extent of his incapacity to work, be it partial or total.

Applying these principles to the Commission's findings under the interpretation now being discussed, the decision of the Court of Appeals should be affirmed. The evidence shows *at most* that the combined effects of, or the interaction between, Mrs. Morrison's occupational lung disease and her other physical infirmities produced total incapacity for work. There is no evidence that these other physical infirmities *in and of themselves* were sufficient to cause any incapacity for work. The Commission has found that Mrs. Morrison is totally incapacitated for work due to the combined effects of her lung disease and certain other pre-existing infirmities. It has not found that any of the pre-existing infirmities were sufficient in themselves to cause Mrs. Morrison to have any incapacity for work. Therefore the award must be made for Mrs. Morrison's total incapacity.

## II

An occupational cause or condition need not be the sole cause of an occupational disease in order for the worker to be compensated for the full extent of the incapacity for work caused by the disease.

For a disease to be occupational and therefore compensable under G.S. 97-53(13) "two conditions must be met: (1) It must be 'proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment'; and (2) It cannot be an 'ordinary disease of life to which the general public is equally exposed outside of the employment.'" *Booker v. Medical Center*, 297 N.C. 458, 468, 256 S.E. 2d 189, 196 (1979). If there is a greater risk of contracting the disease by workers in a given occupation because of conditions "characteristic of and peculiar" to the occupation, the "nexus between the disease and the employment which" makes the disease occupational and therefore compensable is provided. *Id.* at 475, 256 S.E. 2d at 200.[15] The statute thus insures by its terms that a

---

15. The disease need not be one which originates exclusively from or is unique to the particular occupation in question. *Booker v. Medical Center, supra.* Nor is the fact that the disease is an ordinary disease of life to which members of the general public also succumb fatal to an occupational disease claim if the "greater

disease, in order to be compensable, must have the requisite causal connection to the occupation out of which it allegedly arose.

The statute, however, does not require that the disease be caused *solely* by occupational conditions in order that the worker be compensated for the full effects of the disease on the worker's capacity to work. Not only is this position supported by authorities from other jurisdictions which have considered the precise question now before this Court, it is also supported by this Court's analysis of a strongly analogous situation in *Vause v. Vause Farm Equipment Co.*, 233 N.C. 88, 63 S.E. 2d 173 (1951).

In *Vause* the worker suffered from epilepsy. He was driving a truck in the course of his employment. Apparently sensing the onset of an epileptic seizure, the worker was able to pull the truck off the road and bring it to a complete stop. He then lay down on the seat of the truck when he suffered an epileptic seizure that caused him to lose consciousness. When he regained consciousness he was hanging onto the steering wheel with his hands. His body was outside the truck with one foot on the running board and the other dangling beside it. The Industrial Commission found that the worker "as soon as he lay down, became unconscious and on account of his illness or seizure moved on the seat of the truck while in an unconscious condition and fell from the seat of the truck to the running board or ground [and] . . . that as a result of the fall . . . suffered a fracture and dislocation of the hip and socket and also a fracture of . . . the pelvis." *Id.* at 90, 63 S.E. 2d at 174. This Court reversed an award of compensation made by the Commission on the ground that there was "no causal connection between the operation of the truck and the injury. The evidence here shows that the plaintiff felt the epileptic seizure coming on. He pulled the truck off the road, parked it, and lay down on the seat in a place of apparent safety, with all of the ordinary dangers of his employment suspended and in repose. We perceive in this evidence no showing that any hazard of the

risk" nexus is present; for in such cases the public is not exposed to the disease equally with those engaged in the particular employment in question. *Id.* Thus diseases of life such as serum hepatitis, tuberculosis and contact dermatitis may be occupational diseases notwithstanding that they are ordinary diseases of life provided that the employee because of his employment has a greater risk of contracting them than does the public generally. *Id.*, and cases cited therein.

employment contributed in any degree to the unfortunate occurrence. The evidence affirmatively shows that it was solely the force of his unfortunate seizure that moved him from his position of safety to his injury. The cause of the fall is not in doubt. It is not subject to dual inferences." *Id.* at 98, 63 S.E. 2d at 180.

The result in *Vause* was based on the Court's conclusion that *no* causal relationship existed between the worker's employment and his fall. In its opinion, however, the Court was careful to point out that had the evidence demonstrated that a condition of the worker's employment contributed to his fall he would have been entitled to compensation for all of the incapacity caused by the fall notwithstanding that an epileptic seizure was also a contributing factor. The Court said, *id.* at 92-93, 63 S.E. 2d at 176:

"The hazards of employment do not have to set in motion *the sole causative* force of an injury in order to make it compensable. By the weight of authority it is held that where a workman by reason of constitutional infirmities is predisposed to sustain injuries while engaged in labor, nevertheless the leniency and humanity of the law permit him to recover compensation *if the physical aspects of the employment contribute in some reasonable degree to bring about or intensify the condition which renders him susceptible to such accident and consequent injury.* But in such case 'the employment must have some definite, discernible relation to the accident.' (Citation omitted.)

"Similarly, it is generally held that where an employee is seized with an epileptic fit . . . and falls due to such . . . causes, even so compensation will be awarded if a particular hazard inherent in the working conditions also contributes to the fall and consequent injury. (Citation omitted.)

. . . .

"It appears . . . that the better considered decisions adhere to the rule that *where the accident and resultant injury arise out of both the idiopathic condition of the workman and hazards incident to the employment, the employer is liable.* But not so where the idiopathic condition is the sole cause of the injury." (Emphasis supplied.)

The Commission in *Vause* took the same legal position as the Court. The Commission concluded, however, that because both the worker's epilepsy and a condition of his employment contributed to his fall, he was entitled to be compensated for the full extent of his incapacity caused by the fall. The Commission did not reduce the award on the ground that his fall was due, in part at least, to a condition unrelated to the worker's employment. This Court in its opinion expressly recognized that if any aspect of the worker's employment had contributed "in some reasonable degree" or had his injuries been the result both of his epileptic seizure and some hazard inherent in his working conditions, the worker would have been entitled to compensation to the full extent of any incapacity suffered in the fall. *Vause* clearly states that the conditions of employment need not be the sole cause of an employee's injury in order for the employee to be compensated for all incapacity for work caused by the injury, even though our compensation statutes require that the incapacity for work must "result from" an "injury by accident arising out of and in the course of the employment." *Compare* G.S. 97-29 and G.S. 97-30 *with* G.S. 97-2(6).

The recognition in *Vause* that occupational hazards need not be the sole cause of an injury in order for the incapacity for work caused by the injury to be fully compensable strongly calls for the same proposition to be applied in occupational disease cases. "Disablement . . . resulting from an occupational disease" is treated the same for compensation purposes as the happening of an injury by accident. G.S. 97-52; *Woods v. Stevens & Co.*, 297 N.C. 636, 256 S.E. 2d 692 (1979). The occupational "causes and conditions," in other words, need not be the sole cause of the disease in order that all incapacity for work caused by the disease be fully compensable. It is enough if these occupational causes and conditions "reasonably contribute," in the words of *Vause*, to the development of the disease.

All cases from other jurisdictions with statutes like ours apply this rule. *Newport New Shipbuilding & Dry Dock Co. v. Director*, 583 F. 2d 1273 (4th Cir. 1978), *cert. denied*, 440 U.S. 915 (1979); *Pullman Kellogg v. Workmen's Compensation Appeals Bd.*, 26 Cal. 3d 450, 605 P. 2d 422, 161 Cal. Rptr. 783 (1980); *McAllister v. Workmen's Compensation Appeals Bd.*, 69 Cal. 2d 408, 445 P. 2d 313, 71 Cal. Rptr. 697 (1968); *Thornton Chevrolet, Inc. v.*

*Morgan*, 148 Ga. App. 711, 252 S.E. 2d 178 (1979); *Riley v. Avondale Shipyards*, 305 So. 2d 742 (La. App. 1975); *Langlais v. Superior Plating, Inc.*, 226 N.W. 2d 891 (Minn. 1975); *Bolger v. Chris Anderson Roofing Co.*, 112 N.J. Super. 383, 271 A. 2d 451 (1970), *aff'd* 117 N.J. Super. 497, 285 A. 2d 228 (1971); *Mueller v. State Accident Ins. Fund*, 33 Or. App. 31, 575 P. 2d 673 (1978). *See generally* 1B Larson, § 41.64(a)(c) (1980).

In all these cases cigarette smoking together with the inhalation of occupational substances produced lung disease (*Newport News Shipbuilding, Pullman Kellogg, Thornton Chevrolet, Riley, Langlais* and *Mueller*) or lung cancer (*McAllister* and *Bolger*). The courts, however, in all cases concluded that because there was evidence that inhalation of occupational substances contributed to the diseases, the diseases were occupational diseases. The courts, therefore, either affirmed compensation awards (*Newport News Shipbuilding, Pullman Kellogg, Thornton Chevrolet, Riley, Langlais* and *Bolger*) or reversed denials of awards by administrative agencies (*McAllister* and *Mueller*).

In *Pullman Kellogg* the worker was totally disabled by lung disease caused in part by his cigarette smoking habit and his exposure to industrial fumes and dust. The medical testimony was that "the probable cause for this patient's pulmonary pathology is due 50 percent to his smoking history and 50 percent to the various fumes over a forty year period." The worker's compensation judge, under a California statute permitting apportionment where an occupational disease aggravated some prior condition or disease, awarded the employee 50 percent of what he would otherwise have been entitled to for total incapacity. The Worker's Compensation Appeals Board, however, reversed the apportionment ruling and the California Supreme Court affirmed the judgment of the appeals board. The Court said, 26 Cal. 3d at 454-55, 605 P. 2d at 424, 161 Cal. Rptr. at 785:

"We come, then, to the application of the foregoing principles. Dr. Sills' opinion that 50 percent of [claimant's] pathology was caused by exposure to harmful substances and the remainder to his smoking habit does not provide a basis for apportionment. It is disability resulting from, rather than a cause of, a disease which is the proper subject of apportionment; 'pathology' may not be apportioned. (Citations omitted.)

> The Sills report does not attribute any part of the disability to [claimant's] smoking of cigarettes; rather, it purports to make an apportionment of 'pathology.' Moreover, it does not state whether [claimant] would have been disabled as the result of the smoking in the absence of the work-related inhalation of harmful substances. For all that appears in the record, he would not have suffered any disability whatever because of his smoking habit if he had not been exposed to damaging substances in his work. In the absence of such evidence, apportionment was not justified."

In *McAllister*, the California Supreme Court said, 69 Cal. 2d at 418, 445 P. 2d at 318-19, 71 Cal. Rptr. at 702-03:

> "We cannot doubt that the more smoke decedent inhaled —from whatever source—the greater the danger of his contracting lung cancer. His smoking increased that danger, just as did his employment. *Given the present state of medical knowledge, we cannot say whether it was the employment or the cigarettes which 'actually' caused the disease; we can only recognize that both contributed substantially to the likelihood of his contracting lung cancer. . . . [T]he decedent's employment need only be a 'contributing cause' of his injury.*" (Emphasis supplied.)

The notion of "reasonable" or "substantial" contribution referred to in these cases is better expressed by the term "significant." The occupational conditions, in other words, must have significantly contributed to the disease's development in order for the disease to be occupational. Significant means "having or likely to have influence or effect: deserving to be considered: IMPORTANT, WEIGHTY, NOTABLE." Webster's Third New International Dictionary (Merriam-Webster 1971). Significant is to be contrasted with negligible, unimportant, present but not worthy of note, miniscule, of little moment. The factual inquiry, in other words, should be whether the occupational exposure was such a significant factor in the disease's development that without it the disease would either (1) not have developed or (2) not have developed to such an extent as to result in the employee's incapacity for work for which he claims benefits.

In this case, of course, the Commission need not have found that Mrs. Morrison's cotton dust exposure significantly con-

tributed to the development of her occupational disease. There was testimony from Dr. Battigelli that Mrs. Morrison's exposure to cotton dust played an insignificant or miniscule role in the development of her lung disease. This evidence would have supported a finding by the Commission that Mrs. Morrison did not have an occupational disease.

The Commission, however, found in accordance with the medical evidence favorable to Mrs. Morrison on this question, that is, that her cotton dust exposure had contributed to the extent of 50 to 60 percent to her lung disease. This is a finding, in effect, that the cotton dust exposure significantly contributed to the development of her lung disease. Under applicable law, consequently, the Commission should not have reduced Mrs. Morrison's award on the ground that some non-occupational factor also contributed to the development of her disease.

Justice CARLTON joins in this dissent.