***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Holmes, with modifications.
The Full Commission in its discretion denies the motion of plaintiff to strike the reply brief of defendants. Defendants questioned whether the Deputy Commissioner had all of the medical depositions before him when he rendered his decision. Whether he did or not, the Full Commission had them before them and as the finder of fact has reviewed the entire record, including all of the deposition testimony and exhibits and all the Transcript testimony and exhibits.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. An employee-employer relationship existed at the time of the alleged accident.
2. International Business Machines is the employer and Liberty Mutual Insurance Company was the workers' compensation carrier on the risk at the time of the alleged accident.
3. Plaintiff's alleged date of injury was March 4, 1998.
4. The parties were subject to the North Carolina Workers' Compensation Act at the time of the alleged incident.
5. The parties have submitted stipulated medical records marked as Exhibit A, except that the Defendants object to pages A-33, 42 and 43 of Exhibit A and the Plaintiff objects to pages A-66.1 and 66.2.
6. The parties tendered stipulated employment records of plaintiff, marked as Exhibit B.
7. Plaintiff's average weekly wage on the date of the alleged incident was $566.42, computing to a compensation rate of $377.61 per week.
 ***********
Based upon the competent and credible evidence and the reasonable inferences flowing therefrom, the Full Commission finds as fact and concludes as a matter of law the following:
 FINDINGS OF FACT
1. IBM is in the business of manufacturing computer cards and other computer related products.
2. On March 4, 1998 plaintiff was 47 years old and had worked for IBM since 1981.
3. Prior to March 4, 1998, plaintiff had a history of neck problems that included a cervical laminectomy at C-7 in 1986 and an interior cervical diskectomy and interior cervical fusion at C6-7 in 1991. Since 1990, plaintiff had been treated by Dr. Samuel Chewning, his orthopedic surgeon on an occasional basis.
4. On January 6, 1998, Dr. Chewning removed plaintiff from work for one week to evaluate his neck symptoms. On January 23, 1998, Dr. Chewning released plaintiff to return to work, but recommended against any kind of heavy lifting, pushing, pulling, twisting, or production type work.
5. After his release by Dr. Chewning, plaintiff was ordered to run the screener machine by his second line supervisor, Mr. John Klish. This was over the objection of plaintiff's immediate supervisor, Malcolm Kennedy, who was concerned because of plaintiff's previous neck problems. Mr. Klish ordered Mr. Kennedy to put plaintiff on the screener machine or fire him.
6. Despite his previous neck problems, plaintiff worked for IBM without incident from early in February of 1998 through March 4, 1998.
7. Plaintiff's job duties on March 4, 1998 included running the screener machine used to produce computer cards. Before each run of computer cards, the screener machine would have to be set up so that the electronic components were placed in the correct positions on the card. A table was prepared using large magnets to properly position the cards. The screener machine consisted of a waist-high bench and a hood above. To perform the set up, plaintiff would lean over the bench (without putting any pressure on it) and underneath the hood of the machine to arrange the magnets and card.
8. On March 4, 1998 at approximately 9:30 a.m. plaintiff was performing a set up on the screener machine and was trying to detach a magnet from the machine so that he could build a new table. As plaintiff snatched the magnets, he felt a pop in the back of his neck and felt a burning, stinging sensation.
9. Some two to three hours into his shift, James Charles Hannibal (another IBM worker) saw plaintiff standing at his machine holding his neck and grimacing. Plaintiff told Mr. Hannibal that his neck had popped. This corroborates plaintiff's testimony.
10. In the late morning of March 4, 1998, Mark Edward Hendrick (another IBM worker) saw plaintiff walking down the hallway looking dazed. Plaintiff told Mr. Hendrick that he hurt himself working on the machine. It appeared to Mr. Hendrick that plaintiff was in pain. This also corroborates plaintiff's testimony.
11. IBM's plant medical notes indicate a history of an abrupt popping in the back of plaintiff's skull and neck at 9:30 a.m. on Wednesday, March 4, 1998, corroborating plaintiff's testimony.
12. After the incident, plaintiff looked for Mr. Kennedy or Mr. Klish, but did not find them and left to go home. Upon arriving home, plaintiff took pain medication and went to bed.
13. On the following day, plaintiff had severe neck pain, headaches and nausea. He called the office of his orthopedic surgeon, Dr. Chewning, and tried to make an appointment. Eventually, he was seen by Dr. Chewning on March 10, 1998 and physical therapy was prescribed.
14. When plaintiff's pain and nausea did not subside, an MRI and bone scan were performed on March 21, 1998. These tests showed a flattening of the plaintiff's spinal cord. Based on these tests, Dr. Chewning scheduled surgery for April 28, 1998, permitting plaintiff to return to work for IBM until the scheduled date of the surgery. Plaintiff presented to Andrea Diedrich, M.D. for a neurology consultation on May 7, 1998.
15. The surgery previously scheduled for April 28, 1998, was performed on May 21, 1998. Dr. Chewning performed an anterior corpectomy at C-4 decompressing C3-4, C4-5; reconstruction with strut graft C-3 to C-5; anterior instrumentation for stabilization AcroMed D.O.C. system; and bone graft from right iliac crest.
16. As a result of his surgery on May 21, 1998, some of plaintiff's symptoms subsided, but his neck pain and head and hand tremors increased. In February, 1999, plaintiff was evaluated by Robert E. Giedraitis, M.D., who diagnosed plaintiff as having elements of chronic pain syndrome, situational depression, poor sleep hygiene and either myofascial pain or upper cervical irritability of the occipital nerves producing headaches.
17. From June 10, 1999 through August 16, 1999, plaintiff was treated by Mark E. Romanoff, M.D., who diagnosed plaintiff as having failed back syndrome — cervical, pain — extremity and chronic headache. Dr. Romanoff performed cervical epidural steroid injections.
18. Dr. Chewning's medical note of March 10, 1998 refers to plaintiff performing "sit ups" and "playing" when he was injured, but Dr. Chewning subsequently corrected his note to reflect that plaintiff was performing "set up" of machines. He explained that his usual transcriptionist did not transcribe the March 10, 1998 office note and the transcriptionist who did, who was unfamiliar with his pronounciation, had mistranscripted "set up" for "sit up." There is other evidence that corroborates plaintiff's testimony that he was injured at work on March 4, 1998.
19. Dr. Chewning rendered an opinion, and the Full Commission finds as fact, that the incident on March 4, 1998 as described by the plaintiff aggravated a pre-existing non-disabling condition of plaintiff that required surgery on May 21, 1998.
20. Dr. Chewning has opined, and the Full Commission finds as fact, that plaintiff is totally disabled from work since the surgery of May 21, 1998 and no improvement in plaintiff's condition is foreseeable.
21. Plaintiff is currently being treated for pain and depression by his family physician, Theodore Suggs, M.D. His medications include Vicadon, Prozac, Trazedone, Celebrex and Promethazine.
22. Patrick Clifford, a certified vocational evaluator, testified, and the Full Commission finds as fact, that as a result of plaintiff's medical condition, his age, education, past work experience, level of disability and medications, plaintiff is unlikely to obtain gainful employment.
23. Paula Medina, a certified life care planner, has prepared a life care plan that identifies plaintiff's future needs to include massage therapy, counseling, group therapy, housekeeping services, lawn care services, alterations to the mirrors on Mr. Smith's car, and a YMCA membership. The Full Commission finds as fact that all of these items, with the exception of housekeeping services and lawn care services, are necessary items to reduce plaintiff's pain.
24. Plaintiff's treatments by Dr. Chewning, Dr. Giedraitis, Dr. Romanoff, Dr. Diedrich, Dr. Finger and Dr. Suggs were related to the plaintiff's incident of March 4, 1998.
25. There is insufficient evidence to prove that prior to March 4, 1998, IBM was made aware that placing the plaintiff on the screener machine violated his restrictions by his treating physician, Dr. Chewning, and could result in injury to the plaintiff, and by so doing, the IBM willfully violated 42 U.S.C.A § 12112(b)(5)(A).
26. Plaintiff has reached maximum medical improvement.
27. This appeal was brought by the insurance carrier. The Full Commission by this Opinion and Award orders compensation to be paid to plaintiff. A reasonable fee to be awarded to plaintiff's counsel as part of the costs is $750.00.
28. There was some evidence that plaintiff applied for and obtained some sort of insurance-funded disability payments.
 ***********
Based upon the foregoing, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff, as a result of his assigned duties, sustained an injury by accident, a specific traumatic incident to his neck on March 4, 1998. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable specific traumatic incident, plaintiff sustained injuries to his neck that have caused him to become permanently and totally disabled since April 28, 1998. Plaintiff is entitled to receive compensation at the rate of $377.61 per week from that date for the remainder of his lifetime unless he has a change of condition. N.C. Gen. Stat. § 97-29.
3. Defendants' evidence and arguments to the effect that, because of numerous automobile accidents and significant degenerative changes to his neck, plaintiff would have required similar neck surgery sometime in the indefinite future regardless of the effects of his specific traumatic incident is to no avail. The specific traumatic incident aggravated an underlying condition making it impossible for plaintiff to work now or any time in the foreseeable future.
4. Plaintiff is entitled to medical compensation necessitated by his neck injury, including but not limited to the medical services provided by Dr. Chewning, Dr. Finger, Dr. Suggs, Dr. Romanoff, Dr. Giedraitis, Dr. Diedrich, and associated medical providers identified in the stipulated exhibits and the services identified in the life care plan prepared by Paula Medina and attached as exhibit one to her deposition other than the housekeeping and lawn care services. N.C. Gen. Stat. § 97-25.
5. To the extent that disability payments were made to plaintiff from a disability plan wholly funded by defendants, defendants are entitled to a credit in accordance with and pursuant to N.C. Gen. Stat. § 97-42.
6. A work-related injury need not be the sole cause of an employee's problems to render an injury compensable. If the work-related accident contributes in some reasonable degree to plaintiff's disability, the employee is entitled to compensation. Smith v. Champion International,517 S.E.2d 164, 166, 134 N.C. App. 180 (1990); Hoyle v. CarolinaAssociated Mills, 470 S.E.2d 357, 359, 122 N.C. App. 462, 465 (1996). "In determining the effect of an injury on a pre-existing, non work-related infirmity where the injury materially accelerates or aggravates a pre-existing condition to such an extent that it causes death or total disability, the injury is compensable even though it would not have caused death or disability to a normal person." Mitchell v. FieldcrestMills, Inc., 353 S.E.2d 638, 640, 84 N.C. App. 661 (1987).
7. It is obvious that the present case falls squarely within the situations described by the courts in Smith, Hoyle and Mitchell. There is no question that Mr. Smith suffered from neck problems for a long period prior to March 4, 1998. It is equally clear from the evidence, however, that Mr. Smith was able to work prior to the March 4, 1998 incident, that the job he was performing on that day put him at direct risk for the type of injury he sustained, and that Mr. Smith suffered a substantial aggravation by specific traumatic incident on March 4, 1998.
8. North Carolina courts have ruled that where compensable and noncompensable causes concur to cause a disability, the defendants are responsible for the entire disability: "When a pre-existing, non-disabling, non-job-related condition is aggravated or accelerated by an accidental injury arising out of and in the course of employment. . . . so that disability results, then the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent." Wilder v. Barbour BoatWorks, 84 N.C. App. 188, 196, 352 S.E.2d 690, 694 (1987) (quotingMorrison v. Burlington Industries, 304 N.C. 1, 18, 282 S.E.2d 458, 470
(1981)).
9. The defendants also argued that Deputy Commissioner Holmes ignored the testimony of Mr. Smith's other doctors to the effect that they could provide no opinion as to causation. Dr. Van Der Veer and Dr. Mokris stated that they had not treated Mr. Smith for several years prior to his Match 4, 1998 accident and had no opinion regarding causation. Dr. Van Der Veer stated "I have no way of agreeing or refuting it. I did not see him. I did not take care of him. I've no idea what happened to him at that time. I mean, I was out of the picture for eight years at that time." Dr. Mokris testified in a similar fashion. Dr. Finger also refused to give an opinion as to causation, leaving that up to Dr. Chewning. Therefore, any testimony by Dr. Van Der Veer, Dr. Finger or Dr. Mokris regarding the causation of Mr. Smith's neck problems on March 4, 1998 was given its proper weight by the deputy commissioner.
10. The defendants also argued that the testimony of James Charles Hannibal and Mark Edward Hendrick should be excluded as hearsay. Their testimony is, however, admissible under the North Carolina Rules of Evidence. Much of their testimony is not hearsay at all, but rather things they actually observed. Mr. Hannibal testified that on March 4, 1998 approximately two to three hours into the shift he saw Mr. Smith standing at his machine holding his neck and grimacing. (T. pg. 93 lines 7-8) Mr. Hendrick testified that on that same day in the late morning he saw Mr. Smith walking down the hallway looking dazed. Mr. Hendrick stated: "He was kind, you know, just walking around. I could tell he was in extreme pain." Mr. Smith's statements regarding the accident and his pain, although hearsay, were also properly admitted as exceptions to the hearsay rule because they describe his "then existing mental, emotional or physical condition." N.C. R. Evidence 803(3); Bowers v. Olf,122 N.C. App. 421; 470 S.E.2d 346 (1996).
11. The defendants also argued that testimony of Mr. Malcolm Kennedy concerning statements made by Mr. John Klish was hearsay and should also have been excluded from the record. Again, the defendants' arguments are unfounded. In his deposition, Mr. Smith's immediate supervisor, Mr. Malcolm Kennedy, testified that Mr. Kennedy's manager, John Klish, ordered Mr. Kennedy to place Mr. Smith on the screener machine. Mr. Kennedy objected: "and I'd questioned him because of the condition of Donny. I know he had problems with his neck and back and he had not run the machine before. We had that discussion and his take was: `He's trained on the machine, place him on the machine." Mr. Kennedy further testified that "During the conversation, when I first objected to putting him on the line, he [Klish] said he [Smith] was trained for that, we needed to put him on the line, and I said `Well what if he can't do it?' His response was: `Either then you fire him or' — he made a gesture as if to say that's the only other alternative. So I took it to be that if he couldn't do the job, either put him on the line or, if he couldn't do it, fire him." Mr. Kennedy's statements are not hearsay because they were not offered to prove that Mr. Smith was going to be fired, but rather to show why he returned to work on this particular machine, that he could work and that he was not disabled prior to March 4, 1998. The defendants have argued throughout this claim that Mr. Smith was disabled prior to March 4, 1998, but this testimony clearly shows that IBM did not consider him disabled.
Even if Mr. Kennedy's recitation of Mr. Klish's statements is hearsay, the statements are admissible party admissions because Mr. Klish was an employee of IBM who had the authority to make such statements. Under 801(D) of the N.C. Rules of Evidence, a statement by a party-opponent's agent or servant concerning a matter within the scope of his employment is admissible.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. As a result of plaintiff's compensable injury to his neck on March 4, 1998, he is entitled to total and permanent disability benefits pursuant to N.C. Gen. Stat. § 97-29 at the weekly rate of $377.61 from April 29, 1998 unless he has a change of condition. Said amount is subject to an attorney's fee. Of the amount that has accrued, plaintiff is to be paid a lump sum without commutation, subject to an approved 25% attorney's fee which shall be deducted and paid directly to plaintiff's attorney. Of the continuing amount, plaintiff's attorney is to receive every fourth compensation check.
2. Defendants shall pay medical compensation incurred or to be incurred for treatment of the plaintiff's injury giving rise hereto for so long as said treatment tends to give relief, effect a cure or lessen plaintiff's period of disability. The care and other expenses as outlined in the life care plan of Paula Medina are specifically noted to be included as part of this compensation other than housekeeping and lawn care.
3. Defendants shall pay the costs including the expert witness fees of Patrick Clifford and Paula Medina, in the amount of $150.00 each. Defendants shall also pay an expert witness fee in the amount of $335.00 to Dr. Frederick E. Finger, $400.00 to Dr. Theodore Suggs and $600.00 to Dr. Craig Van Der Veer.
4. Defendants shall pay a $750.00 attorney fee to plaintiff's attorney pursuant to N.C. Gen. Stat. § 97-88. Such fee shall not be deducted from any compensation due plaintiff.
5. To the extent that disability payments were made to plaintiff from a disability plan wholly funded by defendants, defendants may offset against compensation otherwise due to plaintiff credits in accordance with and pursuant to N.C. Gen. Stat. § 97-42.
6. Defendants shall pay the costs.
This 15th day of March 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER