* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence, affirms in part, and reverses in part the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * RULING ON EVIDENTIARY MATTER
Plaintiff made a motion to admit medical records of pain management physician Dr. William Blau into evidence before the Full Commission. Defendant objected. The Full Commission herein sustains Defendant's objection.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. Defendant was a duly qualified self-insured, with Key Risk Management Services as the servicing agent.
3. An employee-employer relationship existed between the parties at all relevant times.
4. Plaintiff sustained an admittedly compensable injury on June 30, 1999, which is denoted as I.C. File 976230.
5. Plaintiff sustained a second compensable injury on January 10, 2000, which is denoted as I.C. File 013061. Defendant filed an I.C. Form 60 on July 10, 2000. Defendant noted Plaintiff's average weekly wage was $410.57, which yields a compensation rate of $273.73 per week, at which rate it has paid temporary total disability benefits since July 10, 2000.
6. The issues for determination are:
 a. Whether Plaintiff's pre-existing depression was caused by either compensable injury?
 b. To the extent Plaintiff is disabled as a result of her psychological condition, to what extent is her psychological disability caused by her inability to perform her job duties as opposed to her compensable injuries?
 c. Whether Plaintiff is currently disabled as a result of an aggravation of her psychological condition, which would entitle her to continuing disability benefits?
 d. Is Plaintiff entitled to have Defendant pay for her psychological and psychiatric treatment?
 e. Is Plaintiff disabled from work due to the physical injuries she has sustained?
 f. Has Plaintiff reached maximum medical improvement for the right knee, right shoulder and right foot injuries?
 g. Is Plaintiff entitled to pain management treatment as a result of her compensable injuries?
h. What is Plaintiff's correct average weekly wage?
 i. In the event Plaintiff's psychological condition is not causally related, to what credit is Defendant entitled for past temporary total disability benefits paid?
7. The parties stipulated the following documentary evidence:
a. Medical Records, and
b. I.C. Forms and filings.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was fifty-one years of age and married with one grown son. Plaintiff graduated from high school in 1969, and attended Appalachian State University for one year, but then left school to begin working.
2. In 1970, Plaintiff went to work as a retail clerk for Davis Inc. Department Stores. She steadily advanced in that position and in 1987, was promoted to the Senior Buyer/Divisional Merchandise Manager. In 1991, Plaintiff lost that job when the company went out of business. She continued to work in various full-time positions in health care from 1991 until July 1994, when she accepted a position as a receptionist at Student Health Services at Wake Forest University. She remained in that position until April 1999, when she became a buyer's assistant in Defendant's purchasing department. As a buyer's assistant, Plaintiff's duties included processing American Express cards for University employees, purchasing, maintaining Ikon copier information for the campus copiers, coordinating the CompuMed program, reviewing invoices before they were submitted to accounts payable, preparing requisitions and purchase orders, and general office duties such as copying, filing, faxing and answering the telephone. Plaintiff also had to deliver and pick-up mail from various campus offices.
3. In 1987, Plaintiff reported difficulty sleeping and symptoms of anxiety following the death of her mother and previous death of her father (both due to cancer) and received counseling for approximately 7 months. In 1993, Plaintiff again reported symptoms of anxiety and was prescribed Xanax 25 mg. In 1996, Plaintiff was diagnosed with depression due to the death of her brother from cancer and prescribed Paxil. With the exception of a brief period in May 1996, Plaintiff remained on Paxil from 1996 until 1998. Plaintiff worked full time throughout the 1980's and 1990's, despite experiencing intermittent anxiety and depression, which caused her to miss a few days out of work.
4. In April 1998, after Plaintiff's home was burglarized, she struggled with symptoms of anxiety and in October 1988, Psychiatrist Wayne Denton, at North Carolina Baptist Hospital, diagnosed her with major depressive disorder, recurrent, severe, without psychotic features and post traumatic stress disorder. Dr. Denton prescribed Prozac 20 mg, Ambien 5 mg and Xanax, referred her for counseling with John Mullen, Licensed Clinical Social Worker, and wrote her out of work for one week. Plaintiff returned to work at Student Health on November 3, 1998, and worked full time with Defendant until June 28, 2000. From January 1999 until December 1999, Plaintiff's psychological condition steadily improved. By November 1999, her major depressive disorder and anxiety were in remission. On January 5, 2000, prior to her second compensable injury, Dr. Denton met with Plaintiff and concluded that her psychiatric condition had improved markedly and that her depression was in full remission. Plaintiff's pre-existing psychological condition did not prevent her from working.
5. On June 30, 1999, Plaintiff suffered an admittedly compensable work-related injury, arising out of and in the course of her employment when she tripped and fell over a cement planter, injuring her right knee, left wrist and right foot. She was treated conservatively at Defendant's employee health center and was diagnosed with left wrist sprain, right knee strain and multiple contusions. She underwent an MRI to her right knee which showed chondromalacia of the patellae and medial femoral condyle and multiple contusions and small joint effusion. A July 26, 1999 x-ray of Plaintiff's right foot revealed an angular deformity of the middle phalanx of the second toe causing lateral angulation of the middle phalanx.
6. When Plaintiff's right knee condition did not improve, she was referred to Dr. Walt Curl, a North Carolina Baptist Hospital Orthopedic Surgeon. Dr. Curl diagnosed her with chondromalacia of the patella, medial plica syndrome of the right knee and sprain to the right second toe. On October 14, 1999, Dr. Curl performed a right knee arthroscopy with debridement. Following the surgery he assigned Plaintiff a 15% permanent partial disability rating to her right knee. He placed work limitations on the amount of time she could stand and walk, and recommended that Defendant move work equipment closer to her workstation to alleviate frequent movement involving the right knee. Plaintiff did not miss any work as a result of injuries sustained in the June 30, 1999 workplace accident.
7. On January 10, 2000, Plaintiff suffered a second admittedly compensable work-related injury, arising out of and in the course of her employment when she again tripped over a large cement planter at her office building. When Plaintiff tripped over the planter, she fell to the ground, twisting her right knee and fracturing her right shoulder. Defendant referred Plaintiff to Defendant's Occupational Health Services where she was diagnosed with a contusion and sprain of the shoulder, versus a fracture. An x-ray revealed she sustained a chip of the bottom rim of the glenoid fossa (cavity of the scapula). Dr. Paul Greene of Occupational Health Services placed Plaintiff in a shoulder immobilizer and restricted her from work using the right upper extremity.
8. On January 19, 2000, Dr. Curl examined Plaintiff and diagnosed her with right shoulder strain and sublaxtion and re-injury of the right knee, as well as a small Bankart lesion at the inferior rim of the right shoulder. Plaintiff also underwent an MRI on that date of the right shoulder which revealed a supraspinatus tendinopathy and post traumatic changes to the AC joint affecting primarily the distal clavicle with resultant inflammation, causing a mass effect on the supraspinatis tendon and subacromial bursitis.
9. Dr. Greene saw Plaintiff again on January 25, 2000, for continued shoulder pain and inability to use her right upper extremity.
10. Plaintiff had increasing difficulty managing her physical limitations, chronic pain and medical treatment following her second workplace accident. Beginning in February 2000, she had trouble sleeping due to chronic knee and shoulder pain and frequently slept only a few hours each night. Plaintiff also struggled to physically perform the demands of her job, which required frequent overhead lifting, walking and getting up and down from her desk and intermittent stair climbing.
11. North Carolina Baptist Hospital Orthopaedic Surgeon, Dr. David Martin, examined Plaintiff on February 3, 2000, due to her significant shoulder pain and inability to reach above eye level. On March 2, 2003, Plaintiff was seen for a follow-up visit with Dr. Martin because of continued right shoulder pain, limited range of motion, recurrent right knee pain, and difficulty sleeping at night because of the pain. Dr. Martin diagnosed her with right shoulder impingement syndrome and right knee chondromalacia. He gave her a work-status note indicating she should not lift overhead or carry heavy objects using the right upper extremity.
12. On March 8, 2000, Plaintiff returned to Dr. Denton. Plaintiff reported increased symptoms of depression, including inability to sleep, crying spells and irritability. She reported problems with shoulder and knee pain caused by the January 10, 2000 workplace injury. Dr. Denton diagnosed her with a major depressive disorder, recurrent, moderate and no longer in full remission. On March 22, 2000, Dr. Denton saw Plaintiff and again noted complaints about continued shoulder pain and again diagnosed her with a major depressive disorder, recurrent.
13. Peter Nachand, Plaintiff's immediate supervisor, testified that Plaintiff regularly reported that she had difficulty performing many of her job duties due to the amount of pain she was experiencing from March 2000 through June 2000. In an effort to make up for her diminished speed and productivity, Plaintiff began taking more work home, staying at work late and working through her lunch hour.
14. In April 2000, Mr. Nachand called a meeting with Plaintiff and human resources personnel and told Plaintiff that although he knew she could not get all her work completed during normal working hours due to chronic pain, injuries and missed time for doctors' appointments, she would no longer be allowed to take work home or work through her lunch break in order to meet deadlines. Human Resources Director, Doris McLaughlin, told her that when she was at work, she was expected to be productive. During the meeting, Plaintiff reiterated that she was working with a significant amount of pain and was having difficulty performing her job because of knee and shoulder pain.
15. On April 5, 2000, Plaintiff was seen by Mr. Mullen who noted that Plaintiff had experienced a return of depressive symptoms, felt excluded from her son's wedding plans and was experiencing stress related to ongoing physical problems to her shoulder and her workplace accident.
16. Plaintiff saw Mr. Mullen again on April 11, 2000, and reported persistent feelings of depression due to lack of improvement in her shoulder conditions. She also discussed her fear that her shoulder injury may have placed her at increased risk of developing cancer due to her strong family history. Mr. Mullen assessed her with a depressed mood, with an agitated tearful affect. Plaintiff saw Mr. Mullen again on May 2, 2000, and reported withdrawing from others. Mr. Mullen observed she was dysphonic in mood.
17. On April 11, 2000, Dr. Martin saw Plaintiff again for persistent right upper extremity and lower left extremity pain. She reported constant shoulder pain as well as burning, aching, and stinging in the shoulder area. Dr. Martin discussed possible arthroscopic examination, but declined prescribing cortisone for pain relief because of a possible rotator cuff tear.
18. On May 9, 2000, Plaintiff was examined by Orthopedic Surgeon Robert Teasdall for pain secondary to the January 10, 2000 workplace injury, and right second toe pain. Dr. Teasdall noted that Plaintiff had completed a course of physical therapy and multiple medications but was still experiencing significant pain. He also diagnosed her with impingement/tendonitis of the shoulder, patellofemoral syndrome/chondromalacia patella. Dr. Teasdall maintained Plaintiff's restrictions on reaching, pulling, and lifting with the right shoulder and restricted her from going up and down stairs and kneeling. Dr. Teasdall also recommended a course of pain management to treat Plaintiff's symptoms of chronic pain.
19. In May 2000, Mr. Nachand and Ms. McLaughlin met with Plaintiff again and repeated their concerns and directives about her productivity in light of her physical injuries and chronic pain. As a follow-up, Mr. Nachand wrote a memorandum on May 25, 2000, to confirm the substance of the meeting. Mr. Nachand confirmed Plaintiff was to work a thirty-seven and one-half hour week, with thirty minutes of uninterrupted lunchtime each day. Based upon Dr. Martin's restrictions to avoid heavy lifting and moving up and down a great deal, the purchasing department made the following accommodations for Plaintiff: (a) buying ergonomically designed office furniture to be at proper height, and with a footrest, (b) placing a printer at her desk, (c) moving lateral files and a fax machine at her work station, and (d) relocating the American Express binders on a bookcase to minimize the height for reaching. In addition, Plaintiff was instructed to not place critical purchasing materials in overhead cabinets and was told someone else would pick-up the mail for the department.
20. Starting in June 2000, the University began testing the PeopleSoft Computer System. Plaintiff experienced greater anxiety over this change, and found it increasingly difficult to concentrate on her duties due to her increased anxiety coupled with her physical condition and pain. On June 19, 2000, Mr. Nachand told Plaintiff that she might want to find another job because the purchasing department was too stressful for her in light of her knee and shoulder injuries and pain.
21. On May 24, 2000, Plaintiff again saw Mr. Mullen. She reported continuing symptoms of depression and anxiety over her physical injuries and pain and the effect the physical injuries and pain were having on her ability to work. She also reported that her supervisor had asked her to limit her time off during the day for physical therapy and other medical appointments. Mr. Mullen noted that Plaintiff was disconsolate in mood.
22. On June 7, 2000, Dr. Denton noted Plaintiff, "has had some valleys at work [and her] work situation continues to be stressful" and that her knee and shoulder injuries were physical factors confounding her depression.
23. On June 21, 2000, Plaintiff was referred to Orthopaedic Surgeon Courtney Whitman, for a second opinion on her right knee rating and her continued shoulder pain. Dr. Whitman noted post traumatic changes in the acromioclavicular joint and signs consistent with tendonitis of the supraspinatus tendon. Dr. Whitman concluded there was significant objective evidence to support at least a diagnostic decompression and possible arthroscopic distal clavicle resection of the right shoulder.
24. On June 26, 2000, Dr. Curl saw Plaintiff again for follow up for her right knee, right shoulder and right toe. Dr. Curl noted chronic knee, shoulder and toe pain and stated Plaintiff was having increasing problems in physical therapy and continued weakness in her knee and shoulder. He injected Plaintiff with Aristocort and Lidocaine and clarified his earlier work restrictions that she only perform sedentary duties.
25. On June 28, 2000, a meeting was again held to discuss Plaintiff's physical restrictions and difficulties. Mr. Nachand, Angela Duncan Frazier (an employee relations and training specialist with Defendant) and Ms. McLaughlin were present. In the meeting Ms. McLaughlin told Plaintiff to keep a productivity log of all her work activities on a daily basis, that she needed time management skills, and that it was her decision to come to work when she was in pain. Plaintiff expressed her belief that Defendant was not empathetic about her injuries, physical stress and limitations and did not support her efforts to perform her job despite her continued pain and physical disabilities.
26. On June 28, 2000, Dr. Curl, wrote Plaintiff out of work for three days for chronic pain secondary to her workplace injuries. Plaintiff has not returned to work since that date. After June 28, 2000, Plaintiff was incapable of returning to her job or any employment due to being placed out of work and having undergone various surgeries related to her compensable injuries.
27. On June 29, 2000, Plaintiff was seen on an emergency basis by Mr. Mullen who noted she was quite upset, "she was increasingly unable to focus or concentrate or perform effectively [and] had thought about running into a bridge or taking an overdose." Based on her emotional state, Mr. Mullen referred her to the inpatient psychiatric unit at North Carolina Baptist Hospital.
28. Plaintiff was seen later that day by the on-duty North Carolina Baptist Hospital psychological unit Psychiatrist, Dr. Robert Finch. Dr. Finch diagnosed her with major depressive disorder, recurrent, severe with suicidal ideation. In his admission notes, Dr. Finch indicated that Plaintiff reported severe depression, hopelessness, poor work performance, chronic pain. He stated, "Recently she has suffered shoulder and knee injuries at work and has felt lack of support for her recovery." Plaintiff told Dr. Finch that she was having difficulty performing at work because she had sustained injuries while at work that were causing her pain and incapacity at work. Plaintiff remained hospitalized in the inpatient psychiatric unit for three days. During that time, she frequently reported severe anxiety problems with chronic shoulder and knee pain, missing work due to her injury, a perception of a lack of support from Defendant for her attempts to perform her job despite her injuries, and overall feelings of worthlessness as a result of being restricted physically.
29. Attending physician, Dr. Beverly Jones, evaluated Plaintiff on June 30, 2000, at which time he noted she reported severe depression, hopelessness, poor work performance and chronic pain. During the course of her in-patient treatment, Plaintiff reported she did not feel she was getting support at work, and she had overall feelings of worthlessness. Plaintiff was discharged from the in-patient psychiatric program on July 2, 2000, and was referred to the outpatient day hospitalization program from July 2, 2000 through July 7, 2000.
30. On July 6, 2000, Plaintiff was seen by Dr. David Martin who diagnosed her with rotator cuff tendonitis and recommended she remain out of work on a conservative course of care.
31. Plaintiff's son wrote Dr. Denton on July 10, 2000, indicating Plaintiff's caseworker Tricia Royster asked to have a medical note taking Plaintiff out of work due to stress, anxiety and depression related to her compensable injuries. Dr. Denton responded that he would provide her with a note at the next appointment. Dr. Denton sent a letter to Ms. Royster on July 12, 2000, advising it was his opinion Plaintiff's symptoms were at least partially related to her compensable injuries and that she should be out of work for three months. At the July 10, 2000 session with Mr. Mullen, Plaintiff continued to be significantly depressed. She reported feeling overwhelmed at work.
32. On July 17, 2000, Dr. Teasdall performed a resection arthroplasty of Plaintiff's right second toe with pinning.
33. On August 23, 2000, Plaintiff was examined by Dr. Curl who observed she was still having knee pain, crepititus on range of motion, mild effusion, and tenderness over the medial plica area. He recommended she consider another arthroscopic debridement.
34. On August 30, 2000, Dr. Whitman performed a right shoulder arthroscopy with subacromial decompression and arthroscopic resection of the distal clavicle. At her November 14, 2000 follow-up examination, Dr. Whitman noted continuing pain and discomfort in Plaintiff's right knee and persistent inflammation of the right shoulder following surgery. Dr. Whitman saw Plaintiff again on January 29, 2001, at which time he found her unable to resume her previous job duties, and that Plaintiff did not deal well with pain and anxiety. Dr. Whitman prepared a disability statement on February 16, 2001, stating Plaintiff was unable to work due to physical injuries for an unknown time. He also noted that Plaintiff would be a suitable candidate for vocational rehabilitation.
35. Dr. Whitman continued to treat Plaintiff conservatively from December 2000 until August 2001, for continued problems with her right knee and shoulder. During that time period he administered a series of cortisone injections to her right knee and shoulder for pain relief and noted that her inability to deal with pain and anxiety were negatively impacting her symptoms and contributing to their persistence. Dr. Whitman decided to hold off on physical therapy or surgery to the right knee "because the trauma of the injuries, as well as the emotional trauma that is associated with her trying to deal with this now chronic pain and discomfort has had a significant impact upon her psychiatric history."
36. On August 17, 2001, Dr. Whitman performed a second surgery on Plaintiff's right knee, an arthroscopy with synovectomy to the anterior and medial compartments and chrondoplasty to the medial femoral condyle, related to her January 10, 2000 injury by accident. He diagnosed her with a large thickened medial capsule with plica and associated Grade III chrondromalacia medial femoral condyle.
37. On December 13, 2001, Plaintiff underwent an FCE in which she demonstrated an ability to function at the sedentary level with lifting and carrying no greater than 10 lbs. It was noted in the FCE that Plaintiff demonstrated considerable anxiety and poor pain management skills during the evaluation. Dr. Whitman felt the FCE results were valid.
38. On November 19, 2001, Ms. McLaughlin wrote Plaintiff to inform her that long-term disability benefits had been approved and were effective retroactive to January 1, 2001. Plaintiff would be listed as inactive on disability, and she would be eligible for health benefits through December 31, 2003, and COBRA benefits to May 31, 2005.
39. In February 2002, Plaintiff advised Mr. Mullen that she had been doing a job search at the request of her attorney; however, she felt quite anxious while doing so. On February 22, 2002, John Mullen advised Plaintiff to cease her job searching efforts and opined that "she is certainly not capable of working at this time."
40. Dr. Karen Matthews wrote to Plaintiff's long-term disability plan on February 26, 2002, to advise that in her opinion Plaintiff had reached maximum medical improvement for the two workplace injuries and was physically capable of light-duty work. Plaintiff was incapable of employment, however, due to depression, anxiety, post-traumatic stress and regional pain syndrome in the upper right extremity.
41. Dr. Whitman and Dr. Matthews recommended that Plaintiff undergo a course of pain management treatment. On April 29, 2002, North Carolina Baptist Hospital Pain Management Specialist Dr. Robert Spillane evaluated Plaintiff. He assessed her with right knee, shoulder and toe pain secondary to her workplace accidents and resulting surgeries. He recommended nerve studies and an MRI of her shoulder and neck for further diagnostic information and directed her to return in 3-4 weeks for follow-up. Dr. Spillane also noted Plaintiff might have a disc herniation at C6-7 and facet disease. He did not recommend a course of treatment for Plaintiff's knee pain at that time. Thereafter, Defendant denied further pain management treatment.
42. In June 2002, Dr. Whitman determined Plaintiff was at maximum medical improvement physically and assigned her a 15% permanent partial disability rating to the right shoulder, an additional 5% rating to the right knee and a 25% rating to the right toe and noted continued complaints of right knee and shoulder pain. Dr. Whitman stated that he "would not release her to return to work without an agreement from her psychiatrist because of the potential difficulty that she may encounter secondary to her psychiatric history."
43. Plaintiff continued to see Dr. Denton and Mr. Mullen through at least early 2003, and during this period both medical providers diagnosed her as suffering from chronic pain to her shoulder and knee, and major depressive disorder, moderate to severe, recurrent.
44. As a direct consequence of the severe pain and physical limitations from her compensable January 10, 2000 workplace injury, which caused a significant decrease in her job productivity and lessened her ability to concentrate and focus on job tasks, Plaintiff suffered increased anxiety and depression, which progressed in severity and contributed to her incapacity to work. Before June 28, 2000, when she became disabled, Plaintiff had pre-existing psychological conditions, but these conditions were not disabling. As a direct and natural consequence of the pain and physical limitations from her compensable January 10, 2000 injury, Plaintiff's pre-existing psychological condition was aggravated and exacerbated and contributed to her disability. Plaintiff has not reached maximum medical improvement as a result of the aggravation and acceleration of her pre-existing psychological condition.
45. As a result of her chronic pain and physical restrictions resulting from her compensable January 10, 2000 injury and the aggravation and acceleration of her pre-existing, non-disabling psychological condition due to her compensable injury of January 10, 2000, Plaintiff has been incapable of working in any employment since June 28, 2000.
46. As a result of Plaintiff's chronic pain and physical restrictions resulting from her compensable injury, the aggravation and exacerbation of her knee problem from her prior injury and the aggravation and acceleration of her pre-existing psychological conditions due to her January 10, 2000 injury, Plaintiff has been unable to work and earn the wages in her former employment with Defendant or in any employment since June 28, 2000.
47. The medical treatment Plaintiff received as a result of her physical injuries and resulting psychological condition was reasonably required to effect a cure, provide relief and lessen her disability.
48. Plaintiff will need future medical treatment for her compensable injury and psychological conditions. Plaintiff also needs pain management and the treatment recommended by Dr. Spillane to provide relief and lessen her disability. Dr. Spillane should be authorized as one of Plaintiff's treating physicians.
49. Plaintiff's average weekly wage is $489.53, yielding a compensation rate of $326.39.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained two compensable injuries by accident arising out of and in the course of her employment, the first on June 30, 1999, and the second on January 10, 2000. N.C. Gen. Stat § 97-2(6).
2. In the instant case, Plaintiff has offered competent evidence that her pain, physical limitations and disablement due to her compensable January 10, 2000 injury materially aggravated and accelerated her pre-existing, non-disabling psychological condition to such an extent that it contributed to her disability. The aggravation and acceleration of Plaintiff's psychological condition flowed directly from and was a direct and natural consequence of her compensable injury. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and the extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682 (1982); Russell v. Lowe's Products Distribution,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993). Under theRussell test, Plaintiff may establish disability in one of four ways:
 1. The production of medical evidence that she is physically or mentally, as a consequence of the work related injury, incapable of work in any employment;
 2. The production of evidence that she is capable of some work, but that she has, after a reasonable effort on her part, been unsuccessful in her effort to obtain employment;
 3. The production of evidence that she is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or
 4. The production of evidence that she has obtained other employment at a wage less than that earned prior to the injury.
See id. The medical evidence reveals that Plaintiff was physically and mentally, as a consequence of the work related January 10, 2000 injury, unable to return to her pre-injury employment, or any other employment from June 28, 2000 and continuing. Specifically, Plaintiff was taken out of work by medical providers beginning June 28, 2000, and on February 22, 2002, John Mullen advised her to cease her job searching efforts and opined that "she is certainly not capable of working at this time." Dr. Karen Matthews wrote to Plaintiff's long-term disability plan on February 26, 2002, to advise that in her opinion Plaintiff had reached maximum medical improvement for the two workplace injuries and was physically capable of light-duty work; however, Plaintiff was incapable of employment due to depression, anxiety, post-traumatic stress and regional pain syndrome in the upper right extremity. Plaintiff continued to see Dr. Denton and Mr. Mullen through at least early 2003, and during this period both medical providers diagnosed her as suffering from chronic pain to her shoulder and knee, and major depressive disorder, moderate to severe, recurrent.
3. When a pre-existing, non-disabling, non-job related condition is aggravated or accelerated by a compensable workplace accident, such that disability results, the employer must compensate the employee for the entire resulting disability even though it would not have disabled a normal person to that extent.Morrison v. Burlington Industries, 304 N.C. 1, 282 S.E.2d 458
(1981). This is true even though where the injury exacerbates a pre-existing psychiatric condition. Toler v. Black and Decker,134 N.C. App. 695, 518 S.E.2d 547 (1999); see also Calloway v.Memorial Mission Hospital, 137 N.C. App. 480, 528 S.E. 2d 397
(2000). The competent evidence supports a finding that Plaintiff's pre-existing psychological condition was aggravated or accelerated by the January 10, 2000 work accident. The medical records of Dr. Denton and Mr. Mullen clearly reflect Plaintiff's major stressors up to the point when she was hospitalized was due to the stresses of chronic pain due to her work place injuries and her resulting physical restrictions, her inability to work at a productive rate, and the decrease in her concentration and focus, which made it difficult to learn the new computer program installed by Defendant.
4. As a result of her work-related injury of January 10, 2000, Plaintiff's chronic pain and physical restrictions resulting from her compensable injury, the aggravation and exacerbation of her knee problem from her prior injury and the aggravation and acceleration of her pre-existing psychological conditions due to her January 10, 2000 injury, Plaintiff has been unable to work and earn wages in her former employment with Defendant or in any employment since June 28, 2000.
5. Plaintiff has not reached maximum medical improvement as a result of the aggravation and acceleration of her pre-existing psychological condition. Plaintiff is entitled to pain management treatment and other treatment as recommended by Dr. Spillane to provide relief and lessen her disability.
6. Plaintiff's average weekly wage is $489.53, yielding a compensation rate of $326.39. N.C. Gen. Stat. § 97-2(5).
7. Plaintiff is entitled to temporary total disability compensation from June 28, 2000 and continuing until further order of the Commission. Defendant is entitled to a credit for the temporary total disability compensation paid to Plaintiff since July 1, 2000. N.C. Gen. Stat. § 97-29.
8. Plaintiff is entitled to have Defendant pay for medical expenses incurred or to be incurred as a result of her compensable injuries for so long as such treatment is reasonably required to effect a cure, provide relief or lessen Plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, and97-25.1.
9. As a result of her June 30, 1999, and January 10, 2000 injuries, Plaintiff has been assigned permanent partial disability ratings to several body parts. Continuing compensation under N.C. Gen. Stat. § 97-29, is the more favorable remedy for Plaintiff.
10. Any permanent partial disability benefits owed to Plaintiff as a result of her June 30, 1999 injury is reserved for subsequent determination and the parties are instructed to confer and submit the proper form agreement for payment of any rating solely relating to the June 30, 1999 injury that are not in dispute.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved and a credit to Defendant for temporary total disability compensation already paid, Defendant shall pay Plaintiff temporary total disability compensation for the period from June 28, 2000, and continuing until further order of the Commission.
2. Twenty-five percent of the compensation awarded Plaintiff herein is approved as a fee for Plaintiff's attorney and shall be deducted and paid directly to Plaintiff's attorney as follows: (a) twenty-five percent of Plaintiff's accrued compensation shall be deducted and paid directly to Plaintiff's attorney, and (b) thereafter, every fourth check from the compensation due Plaintiff shall be deducted and paid directly to Plaintiff's attorney.
3. Defendant shall pay medical expenses incurred or to be incurred by Plaintiff as a result of her compensable injuries when bills for the same have been approved, in accordance with the provisions of the Act.
4. The parties shall confer and determine if an agreement can be reached on the permanent partial disability compensation, if any, due plaintiff for the June 30, 1999 injury. Such compensation may be paid on a form agreement.
5. Defendant shall pay the costs.
This the __ day of June 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER